Pamela HICKS, et al., Plaintiffs,

v.

State of ALABAMA, et al., Defendants.

No. CIV.A. 97–482–MJ–C.

United States District Court,
S.D. Alabama,
Southern Division.

Aug. 19, 1998.

922

Sherrie V. McKenzie, Law Office David F. Steele, Monroeville, AL, for Pamela Hicks, Beverly A. Perkins, Jacqueline J. Williams, Pamela Thames, plaintiffs.

Ellen R. Leonard, Andrew W. Redd, Kim T. Thomas, Alabama Department of Corrections, Legal Division, Montgomery, AL, for State of Alabama, Joe S. Hopper, Ron Sutton, Thomas A. Gilkeson, Merle A. Friesen, Willie Johnson, Willie Thomas, Billie Lt. Billie Dorriety, Willie Fowler, Gordon Sgt. Jackson, Silas Nelson, defendants.

## FINDINGS OF FACT; CONCLUSIONS OF LAW AND ORDER

CASSADY, United States Magistrate Judge.

This action is before the Court on defendants' motion for summary judgment (Doc. 20). In this action, plaintiffs, who are four female prison guards employed at an all

male prison, allege that they have been discriminated against in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, on the basis of their sex in that they not only have been exposed to a work environment made hostile by the egregious acts of the inmates which are condoned by plaintiffs' superior officers but have been treated less favorably than their male counterparts. Upon consideration of the motion for summary judgment, plaintiffs' response in opposition thereto and all pertinent portions of the record, the Court concludes that the motion is due to be granted.

## FINDINGS OF FACT

There is no contest as to the jurisdiction of this Court and the correctness of the named parties. In addition, based upon the parties' stipulation, the pleadings, deposition and affidavit testimony and other evidence of record, the Court finds as follows:

1. Fountain Correctional Facility (Fountain) is a medium security prison located in Atmore, Alabama, which houses 1055 inmates. A Correctional Officer's initial salary is $17,823.00 in addition to comprehensive health care benefits, retirement benefits and vacation time. The salary paid to a Correctional Officer is the same regardless of what shift he or she works. The female Correctional Officers are paid the same salary and receive the same benefits package as the male Correctional Officers. Each of the plaintiffs in this case is ranked as a Correctional Officer I or CO I.

2. Pamela Hicks (Hicks) was employed by the Alabama Department of Corrections in 1993. She was trained at the Alabama Department of Corrections' academy in Selma, Alabama. Hicks was then assigned to the third shift at Fountain which runs from 10:00 p.m. to 6:00 a.m.

3. Beverly Perkins (Perkins) began working for the Alabama Department of Corrections in 1987. She also trained at the Department's academy in Selma, Alabama. Perkins was first assigned to Staton Correctional Facility, a male prison, and Tutwiler Prison for Women before being transferred to Fountain on December 11, 1995, and assigned to the third shift.

4. Pamela Thames (Thames) began working for the Alabama Department of Corrections in August of 1990. After her training in Selma, she was first assigned to Ventress Correctional Facility, a male prison. Thames was transferred to Fountain and assigned to the third shift in 1991.

5. Jacqueline "Jackie" Williams (Williams) began her employment with the Alabama Department of Corrections in 1991. Williams not only trained at the Department's academy in Selma but received two weeks of on-the-job training at Holman Correctional Facility, a maximum security prison for men. Williams was then transferred to Donaldson Correctional Facility, also a male prison. Williams was thereafter transferred to Ventress Correctional Facility, another male prison, from where she was subsequently laid-off due to budget cuts. In October of 1992, Williams was rehired and assigned to the third shift at Fountain.

6. From 1995 through 1997, Willie Fowler and Gordon Jackson were the Sergeants on the third shift at Fountain and plaintiffs immediate supervisors.[1] Lieutenant Billie Dorriety was the next higher supervisor in the chain of command.[2] Lieutenant Dorriety's immediate supervisor was Captain Silas Nelson.[3] Captain

---

1. According to the "Agreed Facts" set forth by the parties in their Pretrial Order, plaintiffs were assigned a rank of "Correctional Officer I" or "CO I" while the Sergeants were assigned the rank of "Correctional Officer II" or "CO II."

2. Lieutenant Billie Dorriety was assigned a rank of "Correctional Officer Supervisor I" or "COS I."

3. Captain Nelson's official rank was "Correctional Officer Supervisor II" or "COS II."

Nelson answered to Assistant Warden Willie Thomas who, from 1995 to 1996, answered to Warden Willie Johnson. Next in the chain of command is Ron Sutton, one of three Deputy Commissioners[4] who answer directly to Commissioner Joe Hopper, the highest ranking official in the Department of Corrections, who is appointed by the Governor. The plaintiffs have also identified the RME Director, Thomas Gilkeson, and the Director of Treatment, Merle Friesen, as among the management personnel who failed to adequately respond to their complaints of a hostile work environment. Each of these supervisors and officials is male.

7. Plaintiffs allege that they have been discriminated against on the basis of their sex in that they have been "deliberately placed" in an environment made hostile by the egregious acts of the inmates who masturbate on the plaintiffs while making extremely crude remarks and that they have repeatedly requested help from their superiors but that no help has been forthcoming. Plaintiffs essentially argue that, because their superior officers did not make the inmates stop their harassing and disrespectful behavior towards the plaintiffs, these superior officers were condoning the inmates behavior and are therefore guilty themselves of harassing the plaintiffs.

8. Plaintiffs rely in part on an incident report prepared by Pamela Thames on April 22, 1996, regarding the refusal of four inmates to obey her order to cease masturbating in her presence and her request for assistance from Lt. Dorriety. According to Thames:

Lt. Dorriety advised officer Thames, at that time, to take disciplinary action against all four inmates involved in the incident. Officer Thames asked Lt. Dorriety if these inmates could be removed from 5 dorm? Lt. Dorriety informed officer Thames that there was nothing he could do, that these inmates were in 5 dorm segregation, that he had no place else to put them.

Plaintiff's Exhibit 4. Thames then alleges that, after Lt. Dorriety returned to his office and the four inmates continued masturbating in her presence, she ordered another inmate to bring her the water hose and:

After officer Thames received the water hose, she told inmate Durocher to tell Lt. Dorriety, if asked about the hose, that officer Thames was doing the next best thing to help herself get the situation under control since officer Thames did not receive any help from Lt. Dorriety.... When Lt. Dorriety was informed of officer Thames' actions, Lt. Dorriety returned to dorms 5 & 6 entrance. Officer Thames went onto the main hall where Lt. Dorriety informed her that it would be her job if she sprayed down dorm 5 inmates.

*Id.* Thames then reported that all four inmates "will receive disciplinary action for rule violation #38; indecent exposure." *Id.*

9. Plaintiffs also rely on incidences reported by Pamela Hicks who chose also to utilize the grievance procedure which exists for employees of the Alabama Department of Corrections to complain about her supervisor's alleged lack of responsiveness. The grievance procedure involves four distinct steps commencing with the filing of a complaint in Step I with the employee's immediate supervisor. On November 30, 1994, Hicks filed a Step I grievance alleging that her supervisor, Lt. Billy Dorriety, sexually harassed her by failing to do anything about her continuous problem with an inmate who refused her direct order to stop masturbating. In the incident report which accompanied her grievance, Hicks specifically described the following inter-

---

4. The other two Deputy Commissioners were identified as Frank Griswold and John Michael Shavers but it is to Ron Sutton alone that the wardens at Fountain apparently must report.

change which occurred between herself and Lt. Dorriety:

> Officer Hicks asked why couldn't [the inmate] be locked up? Lt. Dorriety replied, "Because I don't have nowhere to put him." Officer Hicks asked Lt. Dorriety if he didn't have one cell in seg[regation]? Lt. Dorriety said "No." Lt. Dorriety asked officer Hicks if she wrote inmate Preston up? Officer Hicks said yes, but asked "how many times can you write up a person for doing the same thing over and over?" Lt. Dorriety answered, "Every time he does it." Officer Hicks then asked Lt. Dorriety, "So what you're saying is I have to go back in there and keep taking his abuse?" Lt. Dorriety responded, "I don't know what else to tell you, Miss Hicks."

Defendants' Exhibit 6 (Hick's Grievance dated November 30, 1994, and attached Incident Report dated November 27, 1994). Hicks' Step I grievance resulted in a determination that proper action had been taken in that the inmate received four disciplinary actions for his behavior on November 27 and 28, 1994, and that Lt. Dorriety did not sexually harass Hicks but only failed to take those actions which Hicks herself wanted taken against the inmate. *Id.* (Memorandum dated March 15, 1995, from Carl Stevenson, Departmental Personnel Director, to Hicks). Hicks then pursued her complaint by filing a Step II grievance on December 16, 1994. *See,* Plaintiff's Exhibit 21. According to her deposition testimony, the only apparent evidence in the record concerning the matter, the Step II grievance also resulted in a determination that Hicks had not been sexually harassed by Lt. Dorriety. Hicks Deposition at 42. The Court agrees, for the reasons set forth below, that these grievances by Hicks and the underlying incident involving a specific inmate do not

evidence sexual harassment in violation of Title VII.[5]

10. Finally, plaintiffs rely on the affidavit testimony of two females who had at one time been correctional officers at Fountain. Jane Carol Lovett was assigned to Fountain in May 1991 and resigned in May 1993. Ms. Lovett's complaints are not only too remote in time but lack sufficient specificity. For example, Ms. Lovett contends "the inmates knew they were not going to be punished" and "[h]ad my superior officer backed me up in disciplining the inmates, their masturbation would not have been as much of a problem." The only **specific** suggestion by Ms. Lovett as an apparent measure to rectify the hostile environment created by inmate masturbation is not to send female correctional officers into the inmate dorms. As stated by Ms. Lovett:

> 12. At the time [she was assigned to Fountain] it was not the custom to send females "down the hall" (to the dorms) at all because the inmates masturbated on the female officers but not the male officers.
>
> 13. However, soon after I got there, Dorriety began to assign us to work the dorms.

Plaintiff's Exhibit Q. It is, however, ludicrous to suggest that a failure to treat female correctional officers differently than their male counterparts with respect to dorm assignments could constitute evidence that the superior officers condoned the sexual harassment of these female correctional officers by the inmates.

11. Maggie Phillips was assigned to Fountain from September 1993 until her transfer to an unidentified location within the Alabama Department of Corrections on April 15, 1995. Ms. Phillips' affidavit is as unspecific as that of Ms. Lovett. It is also impossible, by virtue of Ms. Phillips'

---

**5.** Hicks' subsequent report of inmate Preston's alleged taunts on May 4, 1996 (Plaintiff's Exhibit 8), nearly six months following the night at issue in Hicks' grievances, does not alter the conclusion that any failure to segre-

gate Preston or remove him from the dorm over which Hicks was assigned on November 27, 1994, or otherwise make him stop the masturbation at issue, does not constitute sexual harassment by Hicks' superiors.

failure to designate the date on which any incident occurred, not to find that her contentions are also remote in time to those of the plaintiffs.[6] Like Ms. Lovett, Ms. Phillips intimates that the assignment of female correctional officers to dorms is evidence of her superior's acquiescence in the inmates' egregious conduct. According to Ms. Phillips: "Dorriety began to assign females to work the dorms" and "Lt. Dorriety intentionally assigned [female correctional officers] to work the dorms as he knew the male inmates would masturbate on us." Plaintiff's Exhibit P. As stated above, it is ludicrous to propose that any decision to treat female correctional officers in the same manner as their male counterparts with respect to dorm assignments could ever constitute evidence that the superior officers were sexually harassing and discriminating against the female correctional officers.

12. Not one of the plaintiffs has disputed that, prior to becoming a correctional officer, she was provided job specifications, essential function worksheets, task statements and performance standards. Nor has any plaintiff denied that these documents make abundantly clear that, as a correctional officer, she will be required to observe inmate behavior, strip search an inmate of the opposite sex and monitor all inmate activities, including showering and shaving. Nor has any plaintiff denied that, during her training at the Department of Corrections' academy, she was informed of the type of behavior to expect from inmates, including masturbation, and instructed how to deal with this type of behavior when, not if, it occurred. It is also undisputed that each plaintiff received further on-the-job training and shift briefings at Fountain regarding the proper method of dealing with inappropriate inmate behavior, including masturbation.

13. It is also undisputed that each Correctional Officer, including each of the plaintiffs, is instructed to write inmate disciplinary or behavior citations for conduct that is in violation of the rules and regulations of the Department of Corrections. The plaintiffs admit that they have issued a number of inmate disciplinary or behavior citations for masturbating in violation of Rule 38 of the Department of Corrections. A conviction in disciplinary court has harsh consequences for inmates in that it may include placement in a single cell for disciplinary segregation during which time the inmate is allowed out of the cell only 45 minutes a day, a shower every other day and two meals a day without sweets or seasonings. In addition, such a conviction may result in the loss of store, visiting and telephone privileges or even in the loss of good time credits which will increase the actual time the inmate must serve in prison. None of the plaintiffs has contended that she was in any way prevented by her superiors from writing disciplinary or behavior citations each and every time an inmate masturbated in her presence, threatened her or otherwise violated any rule or regulation. None of the plaintiffs has alleged that her superiors interfered in any way with the trial or punishment of any inmate to whom she gave such a disciplinary or behavior citation. No allegation has been made that the disciplinary or behavior citations issued by the plaintiffs were treated in any manner differently than the disciplinary or behavior citations issued by any of the male Correctional Officers.[7] Consequent-

6. Ms. Phillips contends that "[o]n one particular night" she had been assigned to a dorm but asked to be reassigned because she was upset about the death of a very good friend. Ms. Phillips alleges that Lt. Dorriety refused to reassign her after accusing her of lying.

7. The affidavit testimony of Jane Carol Lovett, a female correctional officer assigned to Fountain from May 1991 to May 1993, that, at some unspecified time, she "wrote up a black male inmate for masturbating [and][t]he disciplinary came up missing" is not evidence sufficient to establish any interference by plaintiffs' superiors or male counterparts with any disciplinary citation they issued during the time period at issue in this litigation. *See,* Plaintiff's Exhibit Q at ¶¶ 18 and 19.

ly, plaintiffs have presented no evidence that their superior officers condoned or acquiesced in any inmates' indecent exposure/masturbation actions or attempts to assault by ejaculating on the plaintiffs in violation of Rule 38 or in any inmates' threatening conduct to the plaintiffs.

14. Beyond a broad sweeping accusation, plaintiffs have presented no evidence to establish that their training on how to deal with masturbating inmates "is completely inadequate, and indeed laughable." Plaintiffs do not contend and have presented no evidence to establish that an inmate guilty of masturbating in the presence of a female correctional officer should be disciplined in any manner differently than an inmate guilty of masturbating in the presence of a male correctional officer. Plaintiff also do not contend that the instruction they received concerning the manner in which an inmate charged with indecent exposure is to be disciplined was different in kind to the instruction given to their male counterparts.

15. The Court also finds that, in contrast to their complaints regarding defendants' alleged failure to help curb the offensive conduct of the inmates toward the plaintiffs, plaintiff Perkins has admitted that in her ten years experience as a correctional officer she has not discovered how to stop inmates from masturbating around female correctional officers. Defendant's Exhibit 10 (Perkins' Deposition at 27). Plaintiff Thames admitted that she was asked by Capt. Nelson for her suggestions regarding how to handle masturbating inmates more effectively and that she never offered any suggestions. Defendant's Exhibit 13 (Thames' Deposition at 55–56). Plaintiff Williams testified that inmates who masturbate should be taken out of the dorm but admitted that the segregation units at Fountain stay full most of the time and that it would be inappropriate to release an inmate segregated for his own protection or for possession of drugs to make room for a masturbator. Defendant's Exhibit 4 (Williams' Deposition at 22–25).

16. In addition to the hostile environment claim, plaintiffs assert that they have been treated less favorably than male correctional officers. In their opposition to defendants' motion for summary judgment on their disparate treatment claim, the plaintiffs argue only that the following separate incidences constitutes sufficient evidence that defendants have treated the plaintiffs less favorably than their male counterparts: (a) Hicks' five day suspension without pay because an alleged altercation took place in the dorm she was manning without her knowledge; (b) a conversation that Hicks reported hearing between CO II Gordon Jackson and CO I James Wasdin; (c) Hick's application for a position as a chain gang officer was lost; (d) Hicks was called off of sick leave to bring in her doctor's excuse and to submit to a urine test; (e) Thames' five day suspension for being inattentive on her post; (f) the off days requested by Perkins were given to a male officer with less seniority; and (g) Perkins received an evaluation score of 33.3 in 1996, her first year at Fountain, when she had received perfects scores of 40 when employed at Tutlweiler Prison for Women. The Court does not find that these alleged incidences constitute evidence of disparate or discriminatory treatment. The Court also finds that the plaintiffs have neither alleged nor presented any evidence to support an allegation that Jackie Williams was subjected to an adverse employment action as to which defendants had treated a similarly situated male employee more favorably.

17. With respect to her suspension, Hicks disputes that an altercation took place on March 1, 1996, in the dorm she was manning which resulted in an injury to an inmate. Although it is unclear to the Court whether the suspension resulted from Hicks' alleged lack of knowledge of the incident or her alleged dishonesty

concerning the incident,[8] it is undisputed that Hicks was afforded not only a suspension hearing at which she was represented by counsel and allowed to call her own witnesses as well as cross-examine opposing witnesses but an opportunity to pursue a grievance concerning the matter.[9] *Compare*, Plaintiff's Exhibit 4a (Hicks grievances) and Defendant's Exhibit 5 (Hicks' Deposition testimony at 29–31). It appears from the record that the officer presiding over the suspension hearing, an official from another prison facility, was required to judge the credibility of Hicks against the credibility of a number of other witnesses and ruled against Hicks. Plaintiffs wisely do not ask this Court to re-adjudicate the suspension itself but, instead, allege that Hicks was discriminated against because a male correctional officer was not suspended as a result of an altercation which caused more serious injury to an inmate under his charge.[10] According to the plaintiffs, the inmate alleged to have been injured under Hicks' purview received only "a superficial abrasion to the back" while:

> On May 5, 1996, an incident occurred in dorm 7 while a male officer was assigned there, Hiram Linton. An inmate was attached [sic] and received a cut above the left eye and a swollen right eye. He also had a cut on his cheek. (Plaintiffs' Exhibit 7.) Linton received no suspension.

Plaintiffs' Brief in Opposition (Doc. 31) at 3. Plaintiffs do not make clear to the Court what violation requiring suspension they allege was committed by Hiram Linton on May 5, 1996. In addition, Plaintiffs have presented no evidence that the two altercations involved similar disciplinary concerns and were thus equivalent. In other words, although Hiram Linton did not personally observe the altercation that occurred while he manned dorm 7, he immediately reported the altercation and, perhaps more importantly, did not ever deny that it occurred. *See*, Plaintiff's Exhibit 7.

18. In support of their disparate treatment claim, plaintiffs also describe a conversation alleged to have been overheard by Hicks on May 13, 1996, in which CO II Gordon Jackson, in response to CO I James Wasdin's suggestion that Jackson write up Pamela Thames for insubordination, is alleged by Hicks to have said "I don't give a goddamn. I'm sick of these bitches complaining all the time." Plaintiffs' Brief in Opposition at 4 (unnumbered) and Plaintiff's Exhibit 3 (Hicks' Incident Report concerning this conversation). Again plaintiffs fail to make clear how such a conversation, even if true, demonstrates that defendants discriminated against the plaintiffs because of their gender. It would seem to the Court that any alleged refusal by Jackson to

---

**8.** According to Hicks' deposition testimony: "There supposedly had been an incident where one of the inmates ... was assaulted. And I didn't see what happened." Defendant's Exhibit 5, Hicks' Deposition at 29. The statement signed by Hicks which was incorporated into the incident report regarding this altercation and inmate injury also alleges that she "had no knowledge of any alleged incident occurring." Plaintiff's Exhibit S. Hicks' position was contrary to the other statements incorporated into the same incident report, namely the statements of CO II Gordan Jackson and CO II W.R. Fowler, each of whom alleged that Hicks was aware of the altercation but would not admit such knowledge. *Id. Compare*, Plaintiff's Exhibit 4a, Hicks' grievances concerning the alleged altercation and her suspension.

**9.** According to the plaintiffs, the memorandum dated September 17, 1996, from Warden II W. Thomas to Deputy Commissioner Ron Sutton relates to Hicks' grievance concerning her suspension. It was Warden Thomas' opinion that Hicks "has not been harassed, discriminated against, or treated unfairly." Plaintiff's Exhibit 3a.

**10.** Although Hicks alleged during her deposition that she knew of two other instances in which male correctional officers were treated differently than females for similar disciplinary infractions (Defendant's Exhibit 5, Hicks Deposition at 33–36), plaintiffs have submitted no evidence to support the allegation.

write Thames up for insubordination might equally evidence an inappropriate indulgence in favor of Thames by virtue of her gender and/or prior complaints rather than an intent to treat plaintiffs less favorably that their male counterparts. It is certainly not sufficient evidence to create a jury question concerning defendants' alleged discriminatory treatment of any of the plaintiffs or alleged condonation of the inmates' sexually harassing conduct toward the plaintiffs.

19. Plaintiffs next rely on their allegation that Hick's application for a position as a chain gang officer was lost. Plaintiffs neither indicate on what date Hicks applied for this position nor explain how the loss of the application indicates that plaintiffs have been treated less favorably than their male counterparts. Plaintiffs make reference to the deposition testimony of Silas E. Nelson, who is Lt. Dorriety's immediate supervisor, which indicates only that Hicks was considered for the job, the applications of all the candidates for that job (all male except Hicks) were lost and that the top five candidates actually got the job. Plaintiff's Exhibit L (Nelson Deposition at 38–42). Although Nelson could not recall the specific basis for selecting the five males chosen over Hicks, he testified that it was "[p]robably attendance records, disciplinary history, experience, things of that nature." *Id.* (at 42). Plaintiffs have submitted no evidence that Hicks was more qualified, or even as qualified, for the job as any of the male correctional officers whose applications for the job were accepted. Absent such evidence, it is simply irrelevant that no woman has ever been assigned to such a position.

20. Plaintiffs next rely on the contention that Hicks was called off of sick leave to bring in her doctor's excuse and to submit to a urine test. Hicks has herself testified that she was merely instructed by Lt. Dorriety to bring a doctor's excuse when she returned to work. Defendant's Exhibit 5 (Hicks Deposition at 55). According to Hicks, it was only after Warden Johnson unsuccessfully attempted to reach her and she then, in response to the message left by Johnson with her sister to the effect that she must bring in a doctor's excuse or be written up for job abandonment, "called them back" with an explanation as to why she was not by the phone, that Hicks was instructed to immediately bring in her doctor's excuse. *Id.* (at 56–57). *See also,* Plaintiff's Exhibit 24 and the attached Defense Exhibit 46(Memorandum from W.E. Johnson to Lt. Dorriety instructing that Hicks be given "1 hr comp time for coming in to give doctor's excuse to the warden and to give urine sample."). Although plaintiffs then challenge the sufficiency of the evidence submitted by the defendants which establishes that the urine test to which Hicks was subjected was random (Plaintiff's Brief in Opposition at 7 (unnumbered)), they submit no evidence that Hicks was not randomly selected for testing or that male correctional officers have not similarly been subjected to urine testing. Finally, plaintiffs have submitted no evidence that defendants did not otherwise have the authority to conduct the urine test at issue. Hicks herself admitted that it was a condition of her employment with the Alabama Department of Corrections that she submit to such urine testing. Defendant's Exhibit 5 (Hicks Deposition at 59).

21. Plaintiffs also contend that Thames' five day suspension for being inattentive on her post at #2 tower is evidence that plaintiffs have been treated less favorably than their male counterparts because the suspension given to a male correctional officer, Hiram Linton, "for the same infraction" was reduced from five days to three days. Plaintiffs' Brief in Opposition at 4 (unnumbered); Plaintiff's Exhibit 17. Although the evidence is sufficient to establish that Linton's infraction was the same as Thames, the evidence proffered by the plaintiffs also establishes that the reduction in Linton's punishment was predicated not only on Linton's "overall work record" but his "waiver of a due

process disciplinary hearing." Plaintiff's Exhibit 17. In contrast to Linton's apparent acceptance of responsibility for his lack of attentiveness, Thames challenged the contention that she failed to respond to Lt. Dorriety's attempts to capture her attention with his flashlight and instead alleged that she was merely having "female problems" and consequently out of sight and non-responsive only because she was using the commode in the tower. Plaintiffs' Brief in Opposition at 4 (unnumbered); Plaintiff's Exhibit 17. Thames' suspension was issued only after a lengthy suspension hearing on July 11, 1996, presided over by an official from another prison facility who at one point suspended the proceedings at Thames request to "go to the south yard and look at the area and see if they could see anyone in the tower sitting on the commode." Plaintiff's Exhibit 17. During the closing statements at the hearing, Thames did not dispute Johnson's observations that "he could see the officer on the commode when she first sat down, however, he felt the officer leaned forward or backwards, thus not allowing the people on the yard to completely see her until she raised her hand" and that "[Thames] could have raised her hand, yelled down to him or done something to let him know that she was there and alert." *Id.* There is therefore no evidence in this record from which it can even be inferred that Thames suspension constituted sexually discriminatory treatment.

22. Plaintiffs next contend that defendants' refused to give Beverly Perkins the "better off-days" she requested while allegedly giving those very days off to a male officer with less seniority who was transferred onto that shift. Plaintiffs' Brief in Opposition at 4 (unnumbered). Plaintiffs have submitted no evidence that the male officer alleged to have receive the off days requested by Perkins indeed had less seniority and was not otherwise entitled to be given those days off. Instead, plaintiffs rely on the alleged conflict during Lt. Dorriety's deposition testimony that, on the one hand, his refusal to grant Per-

kins' request was in order to balance the shift while, on the other hand, he admitted that the shift would have been balanced if Perkins had been granted her request while the male in question was given the days off she was then assigned. The Court finds no conflict in testimony sufficient to establish a material issue of fact concerning the existence of discriminatory treatment. Plaintiffs read too much into a very small portion of the relevant testimony while ignoring the undisputed portion which establishes that Lt. Dorriety's denial of Perkins' request was based on his decision, after problems arose from his prior efforts to accommodate the requests of two or three officers for changes, to comply with regulations which only allow changes in scheduled off days once a year in September. Plaintiff's Exhibit D (Dorriety's Deposition at 102–103).

23. Finally, plaintiffs contend that Perkins received an evaluation score of 33.3 in 1996, her first year at Fountain, when she had received perfects scores of 40 when employed at Tutlweiler Prison for Women. It is undisputed that a score of 33.3 denotes, as does a score of 40, that Perkins performance "exceeds standards." The score of 33.3 apparently constitutes the lower end of the "exceeds standards" evaluation guideline or modem. The only injury alleged to have resulted from this less than perfect evaluation score is purely speculative, namely that "should she receive disciplinary action at any time, it would not be termination." Plaintiffs' Brief in Opposition at 8 (unnumbered). For this reason, *inter alia*, Perkins evaluation score in 1996 does not constitute evidence of discriminatory treatment.

24. No evidence was proffered by the plaintiffs to establish that they were less favorably treated with respect to their post assignments or that they were subjected to any job condition or requirement to which their male counterparts were not also subjected. Certainly no evidence was presented that plaintiffs were required to sign in

and out from breaks and to give the hospital keys to the nurses during pill call while their male counterparts were not. It is undisputed that these procedures applied to both male and female correctional officers.

## CONCLUSIONS OF LAW

Summary judgment is appropriate under Fed.R.Civ.P. 56 "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." 477 U.S. at 323, 106 S.Ct. at 2553. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. 477 U.S. at 322–23, 106 S.Ct. at 2552–53. Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and ... designate 'specific facts showing that there is a genuine issue for trial.' " 477 U.S. at 324, 106 S.Ct. at 2553. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-

moving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

Despite plaintiffs' efforts to characterize it otherwise, this action is a hostile environment case in which plaintiffs attempt to hold defendants vicariously liable for the sexual misconduct of prison inmates toward female correctional officers. Plaintiffs have presented no evidence that defendants either condoned the inmates' behavior or were able to prevent it but intentionally refused to do so. Plaintiffs attempt to bolster their hostile environment claim by asserting several isolated, unrelated and/or trivial instances of alleged disparate treatment or gender animus. Plaintiffs have, however, also failed to meet their burden of proof relative to each of these allegations of disparate treatment. Plaintiffs have simply failed to establish that they were in any measure treated less favorably than their male counterparts.

■ As the plaintiffs themselves have argued, in order to assert a claim of hostile working environment sexual harassment against the named defendants, they must first prove the following in order to establish a *prima facie* case:

(1) that the employee belongs to a protected group, [*Henson* v. *Dundee,* 682 F.2d 897, 903 (11th Cir.1982) ]; (2) that the employee was subjected to "unwelcome" sexual harassment, [*Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399,2406, 91 L.Ed.2d 49 (1986) ]; *Henson,* 682 F.2d at 903; 29 C.F.R. § 1604.11(a) (1985); (3) that the harassment complained of was based on sex, *Henson,* 682 F.2d at 903; and (4) that the harassment complained of affected a "term, condition, or privilege" of employment in that it was "sufficiently severe or pervasive 'to alter the conditions of the [victim's] employment and create an abusive working environment.' " *Vinson,* 477 U.S. 57, 106 S.Ct. at 2406

(brackets in original)(quoting, *Henson,* 682 F.2d at 903).

*Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1557 (11th Cir.1987). Plaintiffs then argue:

> Section 219(2)(d) of the Restatement (Second) of Agency ... provides that the master is liable for the torts of the servant acting outside the scope of his employment whre [sic] the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority.

Plaintiffs' Brief in Opposition at 5 (unnumbered). The Supreme Court has recently discussed at some length the relevance of "traditional principles of the law of agency in devising standards of employer liability" in the context of Title VII's proscription against sexual discrimination and harassment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). The analysis even addressed "the aided-by-agency-relation principle embodied in § 219(2)(d) of the Restatement" relied on by the plaintiffs in the case at bar but did so only in the context of "vicarious liability for misuse of supervisory authority." 524 U.S. 775, 118 S.Ct. at 2290–93 (emphasis added). Even in that limited context, the Supreme Court cautioned:

> [O]ur obligation here is not to make a pronouncement of agency law in general or to transplant § 219(2)(d) into Title VII. Rather, it is to adapt agency concepts to the practical objectives of Title VII. As we said in *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986), "common-law principles may not

be transferable in all their particulars to Title VII."

524 U.S. 775, 118 S.Ct. at 2291, n. 3. Plaintiffs have cited no legal or factual authority in support of their claim that the inmates who sexually harassed them were the "agents" or "servants" of the named defendants for purposes of Title VII liability.[11] In addition, plaintiffs have certainly failed to either allege or establish that "there was reliance [on their part] upon apparent authority [of the harassing inmates]" as would be required under plaintiffs' proposed application of § 219(2)(d).

█ Plaintiffs admit that not one of the named defendants is guilty of having personally subjected any one of the plaintiffs to "'unwelcome' sexual harassment." The offensive behavior is alleged only to be that of the inmates. According to the plaintiffs, defendants' guilt is predicated solely on defendants having assigned plaintiffs to locations where the inmates could sexually harass the plaintiffs by, *inter alia,* masturbating on or around them and on defendants' failure to make the inmates stop such harassment. Plaintiffs have, however, presented no evidence that they were treated any differently with respect to post assignments than their male counterparts. Plaintiffs have also disregarded the legal precedent which requires that the job and shift assignments of female correctional officers be made without regard to the officer's sex and thus in the same manner as their male counterparts. *See e.g., Sims v. Montgomery County Comm'n,* 766 F.Supp. 1052, 1062–67 (M.D.Ala.1990)(rejecting, inter alia, defendants' rationale for permitting only female officers to be assigned to areas where female inmates are housed and limiting fe-

---

11. Plaintiffs do not even address *Pettco v. White,* 896 F.Supp. 1137, 1146 (M.D.Ala. 1995), *aff'd,* 98 F.3d 1353 (11th Cir.1996), a suit brought by the victim of an automobile accident caused by an Alabama inmate who was driving a state vehicle. The plaintiff in *Pettco* unsuccessfully challenged, on constitutional grounds, Alabama's policy decisions not to acknowledge that the inmate drivers are agents or employees of the State and not

to provide them with insurance. It is difficult to imagine on what basis the plaintiffs in the case at bar can seek to characterize the inmates at Fountain as agents of the named defendants when Alabama law itself declares that, whenever permitted to drive a state-vehicle, "[n]o inmate ... shall be deemed to be an agent, employee or involuntary servant of the board [of corrections]." Ala.Code §§ 14–8–5 and 14–8–40 (1975).

male officers' exposure to other areas manned by male officers).

■ To the extent plaintiffs seek to hold the defendants liable for their inability to alter the inmates alleged propensity to masturbate in the plaintiff's presence, plaintiffs have themselves been unable to identify any measure which could have been employed to curtail the inmate's conduct but was deliberately withheld by the defendants. Plaintiffs do not challenge the appropriateness of issuing disciplinary or behavior citations to inmates who openly masturbate and disobey orders to cease and do not allege that defendants in any way prevented the plaintiffs from employing this disciplinary measure. Although it could be inferred that Thames objected to Lt. Dorriety's interference with her plan to utilize a water hose "to help herself get [four masturbating inmates] under control," plaintiffs have not asserted that such treatment is permissible. *See e.g., Sims v. Mashburn*, 25 F.3d 980, 984 (11th Cir. 1994)("When the conduct in question involves any measure taken to prevent a security threat or restore official control, the Eighth Amendment inquiry is 'whether force was applied in a good faith effort to maintain or restore discipline or inflicted maliciously or sadistically for the very purpose of causing harm.'").

■ As stated previously, plaintiffs have attempted to bolster their hostile environment claim by asserting several isolated, unrelated and/or trivial instances of alleged disparate treatment or gender animus. Both Hicks and Thames have failed to establish that they were treated less favorably than a similarly situated male correctional officer with respect to the five day suspensions each received at different times in 1996. As was made clear in *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir.1998), "[e]vidence of similarly situated employees must be used to support Plaintiff's prima facie case." Hicks failed to establish that the conduct for which she was suspended was similar to that alleged to have been com-

mitted by a male correctional officer who was not suspended. In contrast, Thames did establish that a male correctional officer who committed a similar offense and initially received a similar five day suspension obtained a reduction in the suspension by two days. Thames' evidence, however, also established that, unlike herself, the male officer in question admitted his infraction and waived a due process suspension hearing, facts taken into consideration together with his "overall work record." Plaintiff's Exhibit 17. Evidence that Perkins received a lesser evaluation score at Fountain than she had previously received from different supervisors at Tutweiler cannot itself constitute evidence of discriminatory treatment. *See e.g., Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir.1989)("[D]isciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis."). Neither Perkins' complaint regarding Lt. Dorriety's refusal to give her the off days she requested nor Hick's allegation that her application for a position as a chain gang officer was lost are sufficient to establish a *prima facie* case of disparate treatment based on plaintiffs' gender.

Having failed to establish that they were actually treated less favorably than their male counterparts, plaintiffs present broad sweeping allegations such as: (1) "[t]he officers superior to Plaintiffs used their authority to intimidate and harass these female officers"; (2) there existed "a pattern and practice of Lt. Dorriety being allowed by his superior officers to treat women in a contemptuous and demeaning manner"; and (3) "Lt. Dorriety is just one of those born into the prison family who is resistant to change, in this instance accepting female correctional officers at a male institution." Plaintiffs' Brief in Opposition at 6, 9, and 10 (unnumbered). In another effort to show animus against the plaintiffs, they also rely on the alleged conversation overheard and reported by Hicks. *See,* Finding of Fact 18, *supra.* Even if each of these allegations of sexual animus

934

is taken as true, they are irrelevant since the plaintiffs have failed to meet their burden of establishing a *prima facie* case of disparate treatment, namely that they have been treated less favorably than their male counterparts. *Cf., Jones,* 137 F.3d at 1313 ("Alleged racial animus of a supervisor does not alleviate the need to satisfy the elements of a prima facie case, although statements showing some racial animus may be significant evidence of pretext once a plaintiff has set out a prima facie case."). As was true in *Jones,* whatever Lt. Dorrity's or any of the named defendant's attitudes may be with respect to female correctional officers, plaintiffs have failed to present sufficient evidence that similarly situated male correctional officers were treated more favorably by the defendants than the plaintiffs, that the inmates acted as agents or servants of the defendants, or that the defendants in any way condoned or acquiesced in the offensive conduct of the inmates toward the plaintiffs. Defendants are therefore entitled to summary judgment on plaintiffs' Title VII claims.

■ Defendants are also entitled to summary judgment on plaintiffs' state law claims of assault and battery, negligent supervision, outrage and invasion of privacy, inasmuch as each of these claims is predicated on the same factual allegations as plaintiffs' Title VII, namely the egregious conduct of the inmates. Plaintiffs have failed to prove that the inmates were acting as agents or servants of the defendants such that their conduct may be imputed to the defendants. Absent some transgression by an employee for whom a supervisor is responsible, the supervisor cannot be deemed guilty of negligent supervision.

## ORDER

For the reasons stated above, the Court concludes and it is therefore **ORDERED** that defendants' motion for summary judgment (Doc. 20) is due to be and is hereby **GRANTED** and that judgment be entered

in favor of the defendants, the State of Alabama, Commissioner Joe S. Hopper, Deputy Commissioner Ron Sutton, Director Thomas A. Gilkeson, Director Merle A. Friesen, the Alabama Department of Corrections, Warden Willie Johnson, Assistant Warden Willie Thomas, Lt. Billie Dorriety, Sgt. Willie Fowler, Sgt. Gordon Jackson and Capt. Silas Nelson, and against the plaintiffs, Pamela Hicks, Beverly A. Perkins, Jacqueline Williams and Pamela Thames, the plaintiffs to have and recover nothing of the defendants. Costs are taxed against the plaintiffs.