*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2000 FED App. 0091P (6th Cir.)
File Name: 00a0091p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

LATANA SLAYTON,
    *Plaintiff-Appellee,*

    *v.*

OHIO DEPARTMENT OF
YOUTH SERVICES,
    *Defendant-Appellant.*



No. 98-4528

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 97-01742—David D. Dowd, Jr., District Judge.

Argued: January 28, 1900

Decided and Filed: March 14, 2000

Before: JONES, NORRIS, and SILER, Circuit Judges.

———————

## COUNSEL

**ARGUED:** Noelle T. Tsevdos, OFFICE OF THE ATTORNEY GENERAL EMPLOYMENT LAW SECTION, Columbus, Ohio, for Appellant. Edward L. Gilbert, Akron, Ohio, for Appellee. **ON BRIEF:** Noelle T. Tsevdos, Joseph D. Rubino, OFFICE OF THE ATTORNEY GENERAL

1

EMPLOYMENT LAW SECTION, Columbus, Ohio, for Appellant. Edward L. Gilbert, Akron, Ohio, for Appellee.

---

**OPINION**

---

NATHANIEL R. JONES, Circuit Judge. Plaintiff-Appellee Latana Slayton sued Defendant-Appellant Ohio Department of Youth Services ("DYS"), asserting that it violated her right to be free from gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) (West 1999). Slayton claimed *inter alia* that DYS maintained a sexually hostile work environment and that it terminated her because of her gender. After trial, the jury returned a $125,000 judgment for Slayton on the hostile environment claim, but ruled in DYS' favor on the gender discrimination claim. DYS then moved for a new trial, or, in the alternative, remittitur. The district court denied these motions, and DYS now appeals. We agree with the district court's judgment and **AFFIRM** it in all respects.

**I.**

On December 26, 1995, DYS hired Slayton to work as a juvenile corrections officer at the Indian River School ("IRS"), a maximum security institution for young, male lawbreakers. IRS housed young people who had committed a wide range of serious felony offenses, including homicide. Slayton was aware of the environment in which she would be working, and accepted the job with full knowledge that it entailed continuous interaction with criminal offenders.

Slayton's position required that she complete a probationary period before graduating to regular status. In early January 1996, Slayton began a several week training period in which she learned various IRS procedures, including its directives on the limited use of physical force against inmates. After this training period, Slayton was assigned to the "E-Unit." Because of Slayton's limited seniority,

*York City Hous. Auth.*, 890 F.2d 569, 579 (2d Cir. 1989) (holding that a hostile environment deprived victim of "a fair and equal opportunity . . . to succeed at her position"). Indeed, given Slayton's work environment, the district court found that she was "programmed for failure." J.A. at 110. Without evidence that Slayton's reinstatement would unduly displace an innocent third party or result in unnecessary hostility, we cannot conclude that the district court abused its discretion in ordering reinstatement.

**III.**

Because we do not find error in any of the district court's holdings, we **AFFIRM** its judgment.

adduced evidence), DYS has not demonstrated that the award and underlying facts are so incongruous to shock the conscience, fall outside the bounds supportable by proof, or suggest mistake. Accordingly, we hold that the district court did not abuse its discretion in denying DYS' remittitur motion.

### E.

Finally, DYS challenges the district court's grant of Slayton's reinstatement motion. We review the reinstatement grant for an abuse of discretion. *See Hudson v. Reno*, 130 F.3d 1193, 1202 (6th Cir. 1997). It is well-established that reinstatement is an appropriate equitable remedy for Title VII violations. *Id.* Indeed, reinstatement is "the presumptively favored equitable remedy." *Roush v. KFC Nat'l. Management Co.*, 10 F.3d 392, 398 (6th Cir. 1993). However, this presumption may be negated where reinstatement requires the displacement of an uninvolved third party, where hostility would result, or where the plaintiff has found other work. *See id.*; *see also Hudson*, 130 F.3d at 1202. Additionally, reinstatement may be inappropriate when an employer is genuinely dissatisfied with a plaintiff's actual job performance. *See Hudson*, 130 F.3d at 1202; *McKnight v. General Motors Corp.*, 973 F.2d 1366, 1370 (7th Cir. 1992).

DYS argues that because the jury ruled against Slayton on her gender discrimination claim – thereby finding that she was not terminated because of gender – the district court improperly granted reinstatement. However, the jury explicitly found in an interrogatory that the hostile environment adversely affected Slayton's job performance. Additionally, a hostile environment finding necessarily recognizes that "sufficiently abusive harassment adversely affects a 'term, condition, or privilege' of employment." *Yeary v. Goodwill Industries-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir. 1997). Thus, reinstatement is an appropriate remedy when a hostile environment prevented an employee from adequately performing her job. *See Carrero v. New*

however, she was often re-assigned to other units. When on E-unit, Slayton worked alongside Corry Appline, a male fellow corrections officer. Initially, Slayton had a "working relationship" with Appline. However, in late February and early March, Slayton's professional relationship with Appline degenerated. Slayton contended that Appline began "horse playing" and "wrestling around" with the inmates. Appline supplied the inmates with snacks, magazines, and sexually-explicit CDs. Slayton further testified that Appline began playing, often for the duration of an entire shift, lewd music that featured lyrics including "f**k the bi**h" and "me and my bi**h."

Additionally, Appline played music videotapes for the inmates. In Slayton's view, these videos depicted an array of sexually provocative conduct, including risque "grinding" and simulated erotic acts. Moreover, Appline often led the inmates in performing dances to the videos. During these dances, performed in front of both Slayton and the inmates, Appline touched his "private parts," his head, his chest, and "in between his leg[s]." J.A. at 229. Slayton testified that she approached Appline more than twenty times about his behavior, and that he merely replied "too bad." Slayton further asserted that, sometime in March 1996, she reported this behavior to her immediate supervisor, Rose Davidson.

Slayton also alleged that Appline's inappropriate conduct extended to other areas as well. She asserted that he encouraged the youth to drop their towels when she was on shower duty. While she does not contend that he directly instigated such activity, she does state that Appline joked with the kids about this behavior. According to Slayton, Appline laughed even more boisterously when inmates dropped their towels while their penises were erect. Along these same lines, Slayton also alleged that, on one occasion, Appline intentionally sent her to check on an inmate who he knew was masturbating. Slayton believes that Appline intentionally sent her to find the inmate in that activity because Appline was already laughing in her direction by the time she exited the inmate's cell. Finally, on another occasion, Slayton contends

that in response to an inmate's question as to why Slayton was so mean, Appline responded, "maybe she's on her period[;] I don't know what her problem is." J.A. at 249.

In Slayton's eyes, the inmates became increasingly hostile towards her because of Appline's conduct. The inmates began referring to Slayton in a variety of derogatory terms, including "ho ass b**ch" and "skinny[] chicken head." Indeed, Slayton contended that Appline directly undermined her ability to perform her job by informing the inmates: "[D]on't worry about that b**ch; she's not going to be here that much longer; she's going to be fired." J.A. at 243.

After her futile attempts to seek redress from supervisor Davidson, Slayton contends that she spoke with a number of other INS supervisors, including Kirk Braithwaite, the unit administrator, and Linda Bess, the contemporaneous superintendent of IRS. Slayton testified that she began informing Braithwaite of this behavior in March 1996, and that he stated that he would "check into" Appline's behavior. While Braithwaite could not recall meeting with Slayton in March, his notes indicated that by May 1996, he was aware of Slayton's concerns with Appline's behavior. Despite Slayton's direct entreaties, Braithwaite did not promptly report Appline's conduct to anyone or further investigate Slayton's claims. Slayton's contacts with Bess met a similar fate, as Bess merely stated that she would "look into" the situation.

On March 15, 1996, around the same time that Appline's conduct intensified, Slayton allegedly slapped an inmate who shouted profanities at her. The DYS inspector's office conducted an investigation and issued a report on May 17, 1996. The report found that Slayton had unnecessarily used physical force, that she had altered her description of the incident several times, and that she acted negligently in failing to adequately subdue the inmate. The report recommended

court should reduce a jury's verdict only when the judgment "clearly exceeds" the maximum amount of compensatory damages a jury could reasonably award. *Id.* at 156 (citation omitted). Thus, we may reduce a jury award only if it is 1) beyond the range supportable by proof, (2) so excessive as to shock the conscience, or 3) the result of a mistake. *Id.* Moreover, the excessiveness of a verdict is primarily a "matter . . . for the trial court which has had the benefit of hearing the testimony and of observing the demeanor of the witnesses." *Wilmington v. J.I. Case Co.*, 793 F.2d 909, 922 (8th Cir. 1986).

DYS relies heavily on this court's recent unpublished opinion in *Barna v. City of Cleveland*, No. 96-3971, 1998 WL 939884 (6th Cir. Dec. 22, 1998) (unpublished opinion). In *Barna*, the jury awarded the plaintiff $125,000 after she was subjected to behavior by a supervisor who asked her to perform oral sex, bragged about his sexual prowess, made lewd gestures, called her a "white b**ch," and stated that the plaintiff did not "know what it's like unless [she had] a black man." *Id.* at *1-*2. This Court found the award excessive, noting that "[w]ithout persuasive proof that the plaintiff suffered from serious and long lasting symptoms, an award of $125,000 is disproportionate to the harm actually suffered by the plaintiff during her three weeks of employment." *Id.* at *5.

*Barna,* however, is inapposite because the Court expressly premised its holding on the short, three-week duration of the harassment. The record here shows Slayton experienced continuous harassment from Appline for almost fourth months. These aforementioned incidents, occurring on an almost daily basis, included incessant references to Slayton as a "bi*ch," continuous playing of sexually explicit music and videos, and intentionally sending Slayton to observe a masturbating inmate. Even if one might consider the award generous, *see Koster v. Trans World Airlines, Inc.*, 181 F.3d 24, 34 (1st Cir. 1999) (holding that remittitur is not appropriate because the award is "extremely generous," but is only allowed when the award is "grossly disproportionate" to

Robinson, nobly turning the other cheek and remaining unaffected in the face of constant degradation." *See Torres v. Pisano*, 116 F.3d 625, 631-32 (2d Cir. 1997). With these principles in mind, we look to the following factors to guide this determination: the frequency of the discriminatory conduct; its severity; whether it is physically threatening, humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Morris v. Oldham County Fiscal Court*, No. 98-6117, 2000 WL 38449, at *4 (6th Cir. Jan. 20, 2000).

We cannot conclude that the district court erred in denying DYS' directed verdict motions. Slayton testified, and the jury may have believed, that Appline continuously called her a "b**ch," continuously played sexually explicit rap music and videos, intentionally sent her to check on an inmate who was masturbating, contended that her menstrual cycle was the cause of her problems, and consistently told inmates that they did not need to worry about her as she was a "bi**h" who would be fired soon. Slayton further testified that this conduct began in early March 1996 and continued for four months until her June 20 termination. Moreover, DYS personnel were well aware of Appline's conduct, but nevertheless failed to take any action. Because of the severity and duration of this activity, we conclude that the jury could have reasonably found that Slayton experienced a work environment that a reasonable woman would find hostile. *See Yates v. Avco Corp.*, 819 F.2d 630, 636-37 (6th Cir. 1987); *see also Pisano*, 116 F.3d at 631-32 (holding that plaintiff's claims that supervisor continuously referred to her in sexually derogatory terms raised jury issue on hostile environment claim). Accordingly, the district court did not err in denying the directed verdict motions.

### D.

DYS additionally asserts that the district court erred in denying its motion for remittitur. We review the denial of remittitur for an abuse of discretion. *See Bickel v. Korean Air Lines Co.*, 96 F.3d 151, 156 (6th Cir. 1996). The district

that DYS take "appropriate administrative action" in response to this incident.[1]

On June 20, 1996, DYS terminated Slayton on the purported basis that she inappropriately used physical force during the March 15 incident. Slayton responded by filing an administrative complaint with DYS, alleging that she had been sexually harassed throughout her employment. When those efforts failed to bear fruit, Slayton filed her Title VII complaint in federal court. Slayton alleged *inter alia* that DYS fired her because of her gender and that it maintained a hostile work environment. The district court granted DYS partial summary judgment on a claim not raised on appeal, but denied summary judgment on Slayton's discrimination and hostile environment claims. During trial, DYS moved for directed verdicts at the close of each side's case, asserting that Slayton's allegations supported neither a discrimination nor hostile environment finding. The district court denied these motions, and the jury returned a $125,000 verdict for Slayton on her hostile work environment claim, but ruled in DYS' favor on her gender discrimination claim.

DYS then moved for a new trial, or remittitur in the alternative, contending principally that the district court improperly allowed lay opinion testimony, and that it should not be liable under Title VII when a hostile work environment is created by inmate conduct. Slayton simultaneously moved for reinstatement to her position at IRS. The district court denied a new trial and remittitur, and granted Slayton's motion for reinstatement. In granting reinstatement, the district court noted that although the jury found that DYS had not terminated Slayton on the basis of gender, it nevertheless found – in an interrogatory – that the sexually hostile environment adversely affected her performance. On appeal, DYS challenges the district court's denial of its directed verdict motions, the denial of its new trial motion, and the

---

[1]The district court noted that it "listened carefully to the testimony of the investigating officer and was unimpressed with the conduct and fairness of that investigation." J.A. at 110.

denial of remittitur. DYS also appeals the grant of Slayton's reinstatement motion

## II.

### A.

The denial of a new trial motion "should be reversed only on the showing of an abuse of discretion." *Cathey v. Johns-Manville Sales Corp.*, 776 F.2d 1565, 1573 (6th Cir. 1985); *see also United States v. Fullerton*, 187 F.3d 587, 592 (6th Cir. 1999). DYS contends that the district court improperly allowed Braithwaite and Bess to offer lay opinion testimony on whether Appline's conduct violated its internal sexual harassment policy. DYS cites a portion of Braithwaite's testimony where he was questioned on a letter he wrote concerning "possible sexual harassment" against Slayton. Additionally, DYS contends that the district court itself elicited improper lay testimony from Bess. Slayton's counsel asked Bess, "if indeed Mr. Appline had brought in CDs that refer to women as bi**hes and f*ck the bit**es, words to that effect, did you feel or do you feel that's a violation of the sexual harassment policy?" J.A. at 366. Bess stated that such conduct is "a violation of rules" and "offensive."

Bess then stated that DYS would employ a third party to investigate the claims. At that point, the district court asked Bess to presume that the allegations had been established, and to consider whether an investigator would be necessary. After Bess twice reiterated the presumption that the court wanted her to draw, the court emphasized:

> Well, it's been determined now. Hypothesize that the plaintiff's testimony is true. In your view does that constitute under the terms of your policy, the state's policy, does that constitute sexual harassment in the workplace?

J.A. at 368. Bess replied, "[a]ccording to our policy, yes; it would be." *Id.* After the district court's exchange with Bess, it instructed the jury that its "instructions [were] coming," that

inmates"). Indeed, where, as here, prison personnel intentionally manipulate non-agents in ways that create a discriminatory environment, and prison supervisors fail to take steps to remedy known discrimination, the resulting discrimination is properly attributable to the prison.

### C.

DYS also appeals the denials of its directed verdict motions, contending that Slayton's allegations fail to establish an objective hostile working environment under Title VII. We review *de novo* the district court's denial of a directed verdict. *See Snyder v. Ag Trucking, Inc.*, 57 F.3d 484, 490 (6th Cir. 1995). A directed verdict should be granted only if "there is either a complete absence of proof on the issues or no controverted issues of fact upon which reasonable persons could differ." *Aparicio v. Norfolk & W. Ry. Co.*, 84 F.3d 803, 806-07 (6th Cir. 1996) (citation omitted).

A plaintiff establishes a hostile work environment "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Williams v. General Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999). A complainant must establish that the working environment is both subjectively and objectively hostile to satisfy this requirement. *Id.* at 560-61.

To establish an objectively hostile environment, one must establish that a "reasonable person in the plaintiff's position, considering all the circumstances" would find the environment hostile. *Oncale v. Sundowner Offshore Services, Inc.*, 118 S.Ct. 998, 1003 (1998) (citation and internal quotation omitted). Accordingly, "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 118 S.Ct. 2275, 2283 (1998) (internal citation omitted). While a plaintiff must make a substantial showing to establish a hostile environment, "[h]arassed employees do not have to be Jackie

inmates – people who have been deemed unsuited to live in normal society.").

However, this general rule against prison liability for inmate conduct does not apply when the institution fails to take appropriate steps to remedy or prevent illegal inmate behavior. *See Waymire v. Harris County, Tex.*, 86 F.3d 424, 428-29 (5th Cir. 1996) (holding that because prison took prompt remedial action, jailer did not establish a hostile environment where a fellow jailer circulated a sexually offensive inmate drawing); *Powell*, 37 F.Supp.2d at 1017 (holding that prisons may be liable for sexual harassment where they fail to take "proper preventive and remedial steps with regard to inmate behavior"); *Hicks v. Alabama*, 45 F.Supp.2d 921, 933 (S.D. Ala. 1998) (holding that a prison was not liable under Title VII for hostile work environment when inmates engaged in sexually-explicit behavior, no prison employees engaged in harassment, and no other remedial avenues were available). Similarly, no authority suggests that there is an absolute bar to Title VII liability when prison personnel encourage or instigate illegal inmate behavior. *Cf. L.W. v. Grubbs*, 974 F.2d 119, 122 (9th Cir. 1992) (holding that where prison "independently created the opportunity for and facilitated" an inmate's assault of a prison employee, it was subject to § 1983 liability).

In this case, we initially note that Slayton did not merely allege that inmate conduct created a hostile environment. The record principally supports a finding that Appline himself, with the tacit approval of the prison, engaged in conduct that created a hostile environment. The record shows that Appline continuously played misogynistic rap music, referred derogatorily to Slayton's menstrual cycle, repeatedly called her a "bi\*\*h," displayed sexually-explicit music videos, and performed erotic dances in plain view. Moreover, while inmate conduct is involved in a number of Slayton's other allegations of harassment, it is clear that Appline encouraged, endorsed, and even instigated the inmates' harassing conduct. *Cf. Hicks*, 45 F.Supp.2d at 932 (in holding for prison, noting that "[t]he offensive behavior is alleged only to be that of the

it should not prematurely evaluate the evidence, and that even if the jury concluded that "an action constitutes quote sexual harassment [, it] does not necessarily mean that the plaintiff wins." J.A. at 368-369. DYS contends that the above exchange, including the Braithwaite testimony, "irreparably damaged" its ability to defend itself against Slayton's suit. Specifically, DYS avers that this purported lay opinion testimony embraced a primary issue to be decided by the jury, and that the court's questioning of Bess constituted impermissible vouching for the credibility of Slayton's claims.

We are not convinced by DYS' claims. First, the district court clearly did not vouch for the credibility of Slayton's claims. The court merely, and explicitly, asked Bess to "hypothesize" that Slayton's allegations were true and to offer her conclusion on whether that conduct constituted "sexual harassment" under department policy. By stating "what if it's established . . ." and "hypothesize," the district court patently asked Bess to respond to a hypothetical, and certainly was not vouching for the verity of Slayton's claims. Further, the district court's instruction re-emphasized that the jury should not draw any premature inferences.

DYS' evidentiary claim on the admission of Bess' and Braithwaite's testimony on "sexual harassment" under department policy presents a closer question. Courts should generally exclude inquiries that ask non-expert witnesses to pontificate upon legal questions. *Torres v. County of Oakland*, 758 F.2d 147, 151 (6th Cir. 1985); *see Mitroff v. Xomox Corp.*, 797 F.2d 271, 276 (6th Cir. 1986) (holding, in ADEA action, that lay testimony was improper when witness testified that defendants were engaged in a "pattern of [age] discrimination"). Indeed the *Mitroff* court noted that while lay opinion testimony embracing an ultimate issue is specifically allowed by Fed.R.Evid. 704, it "seldom will be the case when a lay opinion on an ultimate issue will meet the test of being helpful to the trier of fact since the jury's opinion is as good as the witness' and the witness turns into little more than an 'oath helper.'" *Mitroff*, 797 F.2d at 276.

This case is distinct from the *Torres/Mitroff* line of cases because, here, the internal policy clearly formed the predicate of both Bess' and Braithwaite's testimony. The pertinent portions of Bess' testimony deal exclusively with her opinions on the applicability of internal policy to Appline's conduct. At no point did the district court or counsel refer to Title VII liability or standards during this questioning. Braithwaite's letter clearly and expressly addressed internal DYS policy, and even when Bess assented to the district court's query on whether Appline's conduct, if true, would have violated DYS policy, she replied: "*[a]ccording to our policy. . .* it would be." J.A. at 368 (emphasis added). Thus, the testimony did not, in fact, embrace an ultimate issue.

There remains, however, a question on the extent to which the jury might have been confused concerning the interplay of liability under internal policy and Title VII. Even when lay opinion testimony does not technically implicate ultimate legal issues, a district court may properly exclude testimony if "terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular." *United States v. Sheffey*, 57 F.3d 1419, 1426 (6th Cir. 1995). In this regard, we have concluded that a district court abuses its discretion when it "allows a witness to define legal terms, especially terms that carry a considerable amount of legal baggage." *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997).

Therefore, a district court should not presume that a jury of laypersons is well-versed on the distinct legal meanings of "sexual harassment" under an agency's policy and "sexual harassment" under Title VII. Without a specific instruction that policy liability does not equal statutory liability, juries might improperly and prematurely presume guilt. While the district court here did not provide a specific instruction on the distinctions between policy and statutory liability, the district court did immediately instruct the jury to refrain from prematurely evaluating the evidence, or presuming guilt if it found that Slayton established "harassment." It further ordered the jury to await its precise liability instructions

before assessing the credibility of Slayton's claims. Thus, to the extent this testimony might have improperly confused the jury, the district court's instructions cured any potential prejudice.

Moreover, Bess' and Braithwaite's brief testimony on this issue was not so prejudicial as to warrant a new trial. A "[r]eversal based on improper admission of evidence is appropriate only when the admission interfere[s] with substantial justice." *Morganroth & Morganroth v. DeLorean*, 123 F.3d 374, 382 (6th Cir. 1997). *See* Fed.R.Evid. 103(a). Both Bess' testimony and Braithwaite's letter were extremely brief evidentiary elements in the three-day trial, and Slayton introduced wide-ranging evidence that DYS allowed Appline to create a hostile work environment. Even if *arguendo* the district court improperly admitted lay opinion testimony, DYS has not shown that it was prejudiced.

### B.

DYS also argues that it cannot be held liable for a hostile work environment created by prison inmates. Although there is scant appellate case law on this question, it is beyond doubt that inmate conduct, without more, is an insufficient predicate for a hostile environment claim. *See, e.g., Maine v. Oklahoma Dept. of Corrections*, No. 97-6027, 1997 WL 602688, at *2 (10th Cir. 1997) (unpublished opinion) (holding that inmate conduct *per se* is not attributable to a prison); *Powell v. Morris*, 37 F.Supp.2d 1011, 1017 (S.D. Ohio 1999) (noting that correctional employees assume attendant risks, including lewd, sexual behavior by inmates). Prisoners, by definition, have breached prevailing societal norms in fundamentally corrosive ways. By choosing to work in a prison, corrections personnel have acknowledged and accepted the probability that they will face inappropriate and socially deviant behavior. *See Powell*, 37 F.Supp.2d at 1017 ("[A]nyone who works at a prison . . . must expect some off-color interactions. . . . It is absurd to expect that a prison can actually stop all obscene comments and conduct from its