Jean GARRETT, Plaintiff,

v.

DEPARTMENT OF CORRECTIONS
and State of Florida,
Defendants.

No. 5:06–cv–400–Oc–10GRJ.

United States District Court,
M.D. Florida,
Ocala Division.

June 20, 2007.

C. Wes Pittman, Pittman & Perry, PA, Panama City, FL, John Clark Davis, Law Office of John C. Davis, Tallahassee, FL, for Plaintiff.

Edwin Robert Hudson, Laura Beth Faragasso, Henry, Buchanan, Hudson, Suber & Carter, PA, Tallahassee, FL, for Defendants.

## ORDER

WM. TERRELL HODGES, District Judge.

This gender discrimination hostile work environment action, brought under Title VII and the Florida Civil Rights Act, is before the Court for consideration of the Defendants' Amended Motion for Summary Judgment. (Doc. 12). The Plaintiff has filed a response in opposition, (Doc. 18), and the motion is now ripe for disposition. The Court concludes that the Defendant's motion is due to be granted as to the Plaintiff's request for injunctive, declaratory, and other equitable relief, and denied in all other respects.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The pleadings, memoranda, affidavits and other evidence in the record, construed in the manner most favorable to the Plaintiff, disclose the following material, undisputed facts.[1]

### I. The Parties

The Defendant, Florida Department of Corrections, ("DOC"), is an agency of the State of Florida which operates approximately 68 prison facilities throughout the state. The DOC is responsible for all aspects of inmate supervision and care, including the provision of medical, dental and mental health services to inmates. The Office of Health Services, an agency within the DOC, supervises approximately 1,950 caregivers, including physicians, nurses, mental health professionals, pharmacists and dentists.

Several of the 68 prison facilities house close management custody inmates. Close management custody is used by the DOC as a security and management technique. It involves the confinement of an inmate apart from the general inmate population "where the inmate, through his or her behavior, has demonstrated an inability to live in the general population without abusing the rights and privileges of others." Chapter 33–601.800, Florida Administrative Code. This designation is for the most difficult, incorrigible, and unmanageable inmates in DOC custody. Privileges and freedom of movement are severely limited; close management inmates spend almost the entirety of each day in solitary confinement, with only a very limited time for exercise outside their cells.

The Plaintiff, Jean Garrett, is a female who currently resides in Lake County, Florida. Garrett was employed by the

---

1. In opposition to summary judgment, the Plaintiff has submitted an extraordinary amount of materials, including almost all of the discovery materials and copies of the summary judgment motion papers for every plaintiff in a separate class action lawsuit in the Northern District of Florida. The Court has reviewed those materials, and will limit its discussion to the evidence that is relevant to this Plaintiff's claim only.

DOC as a Registered Nurse Specialist, ("RN"), at the Lake Correctional Institution ("Lake Correctional") in Lake County, Florida, from January 4, 2002 through her resignation in September 2002. Following her resignation, Garrett would periodically work shifts at LCI as a temporary employee until May 2005. As an RN at Lake Correctional, Garrett worked primarily as a psychiatric nurse in Lake Correctional's psychiatric/mental health facility. Her duties included providing health care services to inmates throughout the facility, including those in close management custody.[2] More specifically, she assessed patients and made daily rounds, responded to medical and psychiatric emergencies, and dispensed medications to inmates. She was in regular contact with close management custody inmates.

## II. Garrett's Employment

Beginning within the first two weeks of her employment at Lake Correctional in early 2002, Garrett was subjected to male inmates regularly exposing their genitals to her and openly masturbating at her. The male inmates engaged in such conduct with respect to almost all female nurses. This conduct occurred at almost every prison facility within the supervision of the DOC, and was so commonplace that it became known within the DOC as "gunning."[3]

In addition to gunning Garrett, the male inmates would also make sexually degrading and demeaning comments, including describing Garrett's genitalia in crude terms, and crudely stating the various sex acts they wanted to perform on Garrett. Inmates in all areas of Lake Correctional engaged in this behavior, even when Garrett was escorted by a male or female correctional officer. Close management inmates, however, engaged in the most frequent and most severe types of this conduct, usually during shifts when less experienced security officers were on duty. According to Garrett, approximately 90 percent of the close management inmates intentionally masturbated at nurses.

In an attempt to curtail this behavior, Garrett complained to a co-worker and supervisor. At first, there was no response, then her supervisors at Lake Correctional permitted her to form a committee to develop a protocol for dealing with offensive and obscene inmate comments and gunning. The committee determined that nurses such as Garrett should be authorized to write up inmate disciplinary reports when inmates engaged in gunning and obscene comments. Prior to this time, nurses were not authorized to write disciplinary reports; such reports were solely within the province of correctional officers.

The committee also determined that screens like those used to divide hospital beds could be installed in front of isolation cells and at times in front of the crisis stabilization unit in the psychiatric/mental health facility. The thinking was that if

---

2. Although Lake Correctional was not designated as a close management custody facility, it was the only DOC-designated psychiatric/mental health facility. Close management inmates would often be transferred to Lake Correctional for evaluation and treatment. Approximately 30 percent of Lake Correctional's inmate population was in close management custody.

3. There is some evidence that inmates also masturbated in the presence of male officers and prison employees, but it is undisputed that the majority of this gunning behavior was targeted directly at female nurses and healthcare professionals.

the inmates could not see the nurses, they would not "gun" for them. The screens were not perfect, however; inmates would instead stand on their commodes, sinks, and mattresses in order to be seen over the screens by the nurses while they masturbated. Other than permitting Garrett to form this committee, there is no evidence that any supervisor or official with the DOC investigated any of her complaints or made any further attempts to prevent inmate gunning until after Garrett's employment ended.

Although Garrett completed and filed numerous disciplinary reports, they did not have any effect. Garrett was frequently told that the reports were useless and would be disregarded, and at times the corrections officers she gave them to would not even file them in the computer system. Garrett and other female nurses at Lake Correctional and other DOC facilities also raised other options in the hopes of stopping the gunning and other obscene behavior. They repeatedly asked the management at Lake Correctional to install one-way screens and one-way mirrors around the nurses station and medication room so that close management inmates in isolation could not see Garrett and the other nurses. Management refused their requests, citing budgetary constraints. Garrett also requested that inmates in close management custody be fully dressed when she dispensed their medication or evaluated them. Her request was also denied.

Although some corrections officers were sympathetic to Garrett's situation, most were not. Several corrections officers made comments to Garrett to the effect that she knew she was working in a all male prison when she was hired, and would have to just deal with the gunning,

and that the female nurses deserved whatever treatment they received. Other correctional officers have made statements to Garrett to the effect that "women shouldn't be here in the first place," and "some women ask for it." Many other corrections officers just ignored the inmates' behavior, or refused to deal with it in any way. Garrett worked in this environment for approximately eight months. The last incident which resulted in her resignation involved an inmate who masturbated in her presence for over an hour, despite the pleas of Garrett and the other nurses to have the inmate removed him from the psychiatric/mental health facility. The corrections officers refused to do so because they did not want to shackle the inmate while moving him, and because they did not feel that masturbating was a good reason for a transfer to another section of the facility.

Although she never sought any professional medical or psychiatric care, Garrett felt demeaned as a woman and angry and frustrated with her employer, and suffered from bouts of diarrhea following her shifts. Garrett resigned in September 2002. She found a new job within a very short period of time at a psychiatric hospital, and has suffered no reduction in salary.

## III. DOC Rules and Regulations

During the time of Garrett's employment, there were no rules or regulations specifically addressing gunning or the other obscene conduct inmates directed at Garrett and other female nurses. Instead, the DOC contends that such conduct fell under a general regulation, Section 9–1, which addressed obscenity in general. Violations of this section could result in a sanction of up to 30 days in disciplinary confinement and loss of up to 90 days gain

time. It does not appear that this sanction was used with any frequency, if at all, to curtail gunning and the related conduct Garrett complained of. In addition, Garrett and other female nurses never received any training on how to deal with inmate gunning, and were never warned at the time of their hiring that such behavior existed within the prison.

On March 18, 2003, six months after Garrett's resignation, the DOC developed a protocol to deal with inmate gunning in mental health units. The protocol was developed after several other female employees at other DOC facilities had filed a written complaint with the DOC and filed a class action lawsuit in state court. The protocol directed that such behavior should be first addressed immediately with verbal counseling and instruction, and if that did not work, then the inmate's privilege level would be lowered and a disciplinary report issued. The protocol also authorized the use of visual screens at any time to prevent the inmate from being able to see female staff, and authorized the use of ambulatory restraints if the inmate's behavior continued. Although the protocol noted that gunning typically occurs "most often in confinement settings, in the presence of female staff, typically when female staff approaches the inmate's cell to perform her duties," the protocol did not specifically address gunning by close management inmates who were already in isolation.[4]

In April, 2006, the DOC enacted a rule of inmate conduct specifically prohibiting male inmate exhibitionist masturbation,

Rule 1–6. The rule is referred to as the "Disciplinary Rule for Gunning."[5] The DOC created Rule 1–6 in direct response to a hostile work environment class action lawsuit filed by several female nurses in the Northern District of Florida four years prior. The DOC also recognized the necessity of this rule, because all prior attempts to control gunning had been unsuccessful. The inmate rule of conduct tracked almost verbatim the Florida criminal law which prevented similar conduct by members of the general public. *See* Fla. Stat. § 800.03.

Throughout Garrett's employment, and continuing thereafter, the DOC implemented and maintained comprehensive policies and procedures for reporting discrimination and sexual harassment complaints. These polices were disseminated to all employees through employee procedures manuals, and notices are posted at each facility. However, none of the policies and procedures addressed inmate gunning or other sexual harassment by inmates.

## IV. Procedural History

This case originated as a putative class action in the Fourteenth Judicial Circuit Court, in and for Washington County, Florida, in 2002. Twenty-eight past and present female nurses and other non-security employees at the DOC filed suit, alleging that they were sexually harassed by male inmates in close management custody, and that the DOC fostered and condoned this sexually hostile working environment. While in state court, two classes

---

4. *See* March 18, 2003 Memorandum from Dale Landress, Director of Institutions and Dianne Rechtine, Director of Health Services to Regional Directors of Institutions and Re-

gional Medical Executive Directors. (Doc. 34–3).

5. *See* Exhibit 5, attached to Deposition of Franchatta Barber. (Doc. 27–2).

were certified under a "hybrid" certification scheme: one class sought injunctive and declaratory relief, and the second class sought monetary damages and other individualized relief. Garrett was not one of the original plaintiffs. She joined the lawsuit at some point between her resignation in September 2002 and October 11, 2002.[6]

On March 7, 2006, the DOC removed the case to the Northern District of Florida, Panama City Division. (Doc. 1). On November 9, 2006, the Honorable Richard Smoak, United States District Judge, decertified the class action, and directed that Garrett's claims be transferred to this Court. (Doc. 1). The Court received this case on November 13, 2006. Following a scheduled case management conference before the United States Magistrate Judge, the Court directed Garrett to file an amended complaint, and directed the DOC to file a renewed motion for summary judgment shortly thereafter. (Doc. 7).

Garrett filed her Amended Complaint on November 29, 2006. (Doc. 9). The Amended Complaint consists of two claims: (1) a claim alleging sex discrimination and sexual harassment hostile work environment under the Florida Human Rights Act of 1977 and the Florida Civil Rights Act of 1992, Chapter 760, Florida Statute ("FCRA"); and (2) the same claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Garrett seeks declaratory and injunctive relief, compensatory damages for lost wages and employee benefits as well as compensatory damages for pain and suffering and emotional distress, and attorney's fees and costs.

**6.** Neither party has specified when Garrett joined the class action lawsuit. However, her deposition was taken as a party-plaintiff on

*SUMMARY JUDGMENT STANDARD*

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party." *Samples on Behalf of Samples v. Atlanta,* 846 F.2d 1328, 1330 (11th Cir. 1988). As the Supreme Court held in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact. If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove." *Rollins v. TechSouth,* 833 F.2d 1525, 1528 (11th Cir.1987). The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried.

*DISCUSSION*

The Defendants seek summary judgment on four grounds: (1) that Garrett has not established a *prima facie* case of gender-based hostile work environment; (2) that Garrett did not file a timely charge with either the Equal Employment Opportunity Commission or the Florida Commis-

October 11, 2002, therefore it can be assumed that she joined the lawsuit at some point before that date.

sion on Human Relations; (3) that Garrett has not suffered any damages as a result of her claimed hostile work environment; and (4) that as a former employee, Garrett lacks standing to seek either injunctive or declaratory relief. Garrett challenges the first three of the Defendants' arguments, but agrees that she is no longer seeking injunctive or declaratory relief because she is not an employee of the Department of Corrections. The Court will therefore focus on the first three arguments.

### I. Hostile Work Environment Prima Facie Case

■■■ The gravaman of Garrett's complaint is that the Defendants engaged in a continuing policy and practice of gender-based discriminatory treatment against her by refusing to prevent or significantly curtail the unwelcome, severe, and pervasive sexual harassment by male inmates at the Lake Correctional Institute. In other words, Garrett is proceeding under a theory of "hostile work environment" sexual harassment, which is prohibited by both Title VII and the FCRA.[7] *See Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1279 (11th Cir.2003). The first step in analyzing a hostile work environment claim is Garrett's *prima facie* case. To establish a *prima facie* case of hostile work environment sexual harassment, Garrett must show that: (1) she belongs to a protected group, (2) she has been subject to unwelcome harassment; (3) the harassment was based upon her sex; (4) the harassment "was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatori-

ly abusive working environment;" and (5) the employer is responsible for such an environment. *Walton*, 347 F.3d at 1279–80.

The Defendants only challenge one of the elements of Garrett's *prima facie* case: whether the harassment "was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment." The Supreme Court has identified four factors to consider in determining whether harassing conduct is sufficiently severe or pervasive to alter an employee's terms or conditions of employment: (1) "the frequency of the discriminatory conduct;" (2) the severity of the conduct; (3) whether the conduct "is physically threatening or humiliating, or a mere offensive utterance;" and (4) whether the conduct "unreasonably interferes with the employee's job performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

■■■ Establishing whether harassing conduct is sufficiently severe or pervasive "includes a subjective and an objective component." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1247 (11th Cir.1999). The environment must be "one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Courts must "examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive"

---

7. Because the FCRA was patterned after Title VII and Florida courts have applied decisions relating to Title VII when analyzing claims under the FCRA, the Court's analysis of Garrett's Title VII claim applies equally to her FCRA claims. *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1387 (11th Cir.1998); *Singh v. Green Thumb Landscaping, Inc.*, 390 F.Supp.2d 1129, 1133, n. 2 (M.D.Fla.2005).

to create a hostile working environment. *Mendoza*, 195 F.3d at 1246.

■ Applying this legal framework, the DOC first contends that although the conduct Garrett was subjected to was offensive, the DOC cannot, as a matter of law, be held liable for the conduct of its inmates.[8] In support of this argument, the DOC cites to several cases from other jurisdictions. However, these decisions either support Garrett's claims,[9] or are factually inapposite to this case.[10] In short, the DOC has presented no evidence or persuasive legal authority demonstrating for summary judgment purposes that they cannot be held liable for the sexually harassing conduct of their inmates, including those in close management custody. To the contrary, the two most recent decisions on this point clearly state that a corrections department can be held liable for inmate sexual harassment directed at female employees, particularly when it is shown that the department refused to take appropriate corrective action.[11] This is just such a case. Although the DOC ap-

---

8. The Eleventh Circuit has previously held that employers may be found liable for the harassing conduct of non-employees if the employer knew or reasonably should have known of the harassment and failed to take immediate and appropriate corrective action. *See, e.g., Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1258, n. 2 (11th Cir.2003). *See also* 29 C.F.R. § 1604.11(e).

9. *See Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006) (holding that state department of corrections could be held liable under Title VII for failure to implement policies to protect its female corrections officers from sexual harassment by male prisoners); *Slayton v. Ohio Department of Youth Services*, 206 F.3d 669, 677 (6th Cir.2000) (upholding jury verdict in favor of female officer subjected to sexual harassment by male inmates where "the institution fail[ed] to take appropriate steps to remedy or prevent illegal inmate behavior."); *Powell v. Morris*, 37 F.Supp.2d 1011, 1017 (S.D.Ohio 1999) (noting that prisons may be liable for sexual harassment where they fail to take "proper preventative and remedial steps with regard to inmate behavior.").

10. For example, the DOC cites to *Cain v. Blackwell*, 246 F.3d 758 (5th Cir.2001) and *EEOC v. Nexion Health at Broadway, Inc.*, No. Civ. A. SA–04–CA–872FB, 2005 WL 3337325 (W.D.Tex. Sept.28, 2005), *aff'd* 199 Fed.Appx. 351 (5th Cir.2006). In both *Cain* and *Nexion Health*, the plaintiffs were nurses working for a nursing home or home health care service which provided services to elderly patients suffering from various physical and mental ailments such as dementia, Alzheimer's disease, and Parkinson diseases, and at times had been declared incompetent. In both cases, the plaintiffs filed suit against his or her employer under Title VII for hostile work environment harassment based on alleged comments made by these patients. And, in both cases, the courts determined that the comments were not sufficiently severe or pervasive to create a hostile work environment, particularly in light of the fact that they were made by elderly and mentally impaired patients who had no control over their behavior. In this case, in contrast, the DOC has presented absolutely no evidence that inmates in close management custody were unable to control their gunning and other obscene behavior, nor have they presented any evidence that any of the inmates involved suffered from any recognizable mental diseases. More importantly, the DOC has not demonstrated that they could not control this inmate behavior. The third decision cited by the DOC, *Hicks v. Alabama*, 45 F.Supp.2d 921 (S.D.Ala.1998), is also inapposite. In *Hicks*, the district court found that there was sufficient evidence demonstrating that there were no available remedial avenues. And, unlike the present case, the plaintiff in *Hicks* was given specific training on how to deal with inmate masturbation and was warned of such conduct in advance. Similarly, in *Vajdl v. Mesabi Academy of KidsPeace, Inc.*, 484 F.3d 546 (8th Cir.2007), the court found an absence of any evidence that the employer condoned or failed to take action to prevent inmate behavior.

11. *See Freitag*, 468 F.3d at 538–41; *Slayton*, 206 F.3d at 677–78.

pears to argue that it could not control its inmates, it has not presented any evidence to that effect. Rather, the evidence demonstrates that it did not take appropriate steps to control inmate conduct until female employees took legal action. The fact that the DOC developed and implemented a new inmate rule of conduct in 2006 which specifically addresses the conduct at issue in this case demonstrates that the DOC can and will take reasonable steps in an attempt to control its inmates when the DOC wishes to do so. Thus, the issue is not that the DOC did not have control over its inmates in close management custody, but rather that it chose not to adequately attempt to control certain inmate behaviors until female employees took legal action.[12] Summary judgment is therefore not appropriate on this basis.

■ The DOC also argues that based on the undisputed facts, the environment Garrett was subjected to was not objectively or subjectively sufficiently severe or pervasive to establish a *prima facie* case of hostile work environment harassment. The DOC focuses on the fact that Garrett testified at her deposition that she was concerned with the admission criteria Lake Correctional used to transfer inmates into the psychiatric/mental health facility for evaluation and treatment. She also testified that it was her belief that inmates faked symptoms and "manipulated" the system to gain access to the facility and isolation cells, and then engaged in gunning and other obscene behavior. According to Garrett, this manipulation prevented inmates who were truly sick from receiving proper care and attention.[13]

The DOC argues that these few statements, taken out of context from a 72–page deposition, constitute Garrett's "primary" complaint. According to the DOC, Garrett was not complaining about the sexual misconduct *per se*, but about the manipulative behavior of inmates trying to gain admission to the psychiatric/mental health unit and the admission criteria. Because Garrett was allegedly more concerned about inmates manipulation the system, the DOC contends that Garrett did not in fact perceive her working environment at Lake Correctional to be hostile or abusive.

The Court disagrees. In order to accept the DOC's argument, the Court would be forced to disregard the bulk of Garrett's deposition testimony, in which she clearly and strongly describes how offensive and demeaning she perceived the constant inmate gunning and obscene comments, and the impact this conduct had on her.[14] The fact that Garrett complained repeatedly, established and participated on a committee formed to address such inmate behavior, and proffered numerous suggestions to cease inmate gunning further demonstrates how offensive she found the conduct. Although she did not seek professional medical treatment, Garrett further

---

**12.** Garrett has also submitted the Expert Report of Art Gutman, PhD, (Doc. 38–2), and the Expert Report of Ron McAndrew CMA, (Doc. 39–2), both of which opine that female employees, including Garrett, were subjected to sexually harassing hostile work environments, which the DOC either ignored or failed to take sufficient actions to control. The reports also list several options for curtailing inmate gunning, none of which were undertaken by the DOC. The DOC has not submitted any expert testimony to refute these reports, nor has the DOC challenged the sufficiency of these reports.

**13.** *See* Deposition of Jean Garrett, ("Garrett Dep."), pp. 26–27, 40, 42, 66, (Doc. 13–1).

**14.** *See* Garrett Dep., pp. 7, 9–10, 25, 42–43, 58, 61–62, 66–68.

testified that she suffered emotional and physical effects from the constant harassment. The DOC cannot counteract this weighty testimony by cherry-picking through her deposition and finding one or two instances where she complained about how inmates are classified as requiring close management and/or psychiatric supervision. Thus, the Court finds that there is sufficient evidence to allow a jury to determine whether Garrett subjectively perceived the environment at Lake Correctional to be severe and pervasive.

Whether there is evidence sufficient to demonstrate objectively unreasonable sexual harassment is a much closer question given the unique environment in which Garrett worked. This case involves criminal inmates, not DOC employees; and, more, it involves the worst criminal sociopaths society has to offer—depraved men who have already demonstrated by their misbehavior that they cannot live and function even in a prison population, but must be separated and kept in perpetual close confinement. What further punishment is available within the constraints of the Eighth Amendment to induce such men to conform their behavior to any acceptable norm? But this case is presently before the Court on motion for summary judgment and there is evidence that: (1) Garrett was not warned about the nature of the work environment before her employment; (2) Garrett was not trained to deal with the work environment; and (3) steps were available, but were not promptly taken, to at least reduce the severity and frequency of the harassing behavior. These circumstances are sufficient to raise an issue of fact concerning whether the work environment at Lake Correctional was objectively unreasonable. Moreover, Garrett has presented undisputed testimony that her complaints to supervisors and corrections officers were largely ignored, and many of her suggestions on how to rectify the situation were denied. It was only several years *after* Garrett and the other female DOC employees filed suit that the DOC took any measurable steps to stop inmate gunning. These undisputed facts are sufficient to raise a jury question as to whether the environment Garrett worked in at Lake Correctional was objectively severe and pervasive. Summary judgment on this ground is therefore due to be denied.

## II. Conditions Precedent

The DOC also attacks Garrett's complaint on the grounds that she did not file a charge with either the EEOC or the FCHR within the appropriate time frames. Garrett resigned from the DOC at some point in September 2002, and ceased her intermittent employment at some point in May 2005. Although she joined the class action at some point between her resignation and October 11, 2002, she did not file a separate charge. Instead, Garrett filed her charge with the EEOC and FCHR on November 29, 2006, approximately two weeks after the case was decertified and her claims were transferred to this Court, and well outside the 300 day time period of Title VII claims, and the 365 time period for FCRA claims. *See* 42 U.S.C. § 2000e–5; Fla. Stat. § 760.11.

It is the law in this Circuit that a plaintiff who does not file a separate, timely charge with the EEOC or appropriate state agency can "piggyback" onto another plaintiff's timely-filed charge provided that "(1) the relied upon charge is not invalid, and (2) the individual claims of the filing and non-filing plaintiff arise out of similar discriminatory treatment and in the same time frame." *Calloway v. Partners Nat'l*

*Health Plans,* 986 F.2d 446, 450 (11 th Cir.1993); *see also Hipp v. Liberty Nat. Life Ins. Co.,* 252 F.3d 1208, 1225 (11th Cir.2001) (forward scope for "piggybacking" onto charges ends on the date the representative charge is filed). In this case, 26 of the former class members filed charges with the EEOC and FCHR on August 31, 2001, and one class member filed her charge on January 9, 2002. There does not appear to be any dispute over the validity of these other charges.[15] The issue is over whether Garrett's claims arise out of similar discriminatory conduct in the same time frame.

Each of these charges alleged violations of the FCRA and stated almost identical facts: the complainant was a female registered nurse working for a facility within the DOC; and the complainant suffered unwelcome sexual harassment by inmates, which the DOC was aware of and failed to take appropriate measures to remedy.[16] Each charge also stated that the harassment was "continuous," and that the DOC engaged in a pattern and practice of harassment. In addition, each class member asked that their charge be filed and treated as a class charge. It appears that these charges do allege similar discriminatory conduct as that complained of by Garrett.

The stickier question is whether the "same time frame" requirement has been met. At first blush, it appears that it has not. The 26 charges filed on August 31, 2001 were filed approximately four months before Garrett began working for the DOC, thus they cannot be said to cover the same time frame. The one charge filed in January 9, 2002 also cannot be relied upon by Garrett because she was only working for four days at the time it was filed, and Garrett contends that the inmate harassment did not start until approximately two weeks after she began her employment.[17] Thus the actions Garrett complains of, while similar to those of the other former class members, occurred well after the class members filed their charges. *See Hipp,* 252 F.3d at 1225–26 ("A single charge cannot be expected to put the EEOC and employer on notice that general policies as applied to different individuals in different officers are being challenged indefinitely.").

However, the Eleventh Circuit has recognized a limited exception for charges filed after the date of the representative charge, and which allege conduct that occurred after the representative charge was filed "[w]here the representative charge clearly alleges a continuing, concrete policy that is illegal, ... such that it might be fair to assume the company has knowledge of later-arising claims challenging the same policy." *Hipp,* 252 F.3d at 1226. In such situations, the representative charge clearly put the EEOC and the employer on notice that additional plaintiffs were likely to assert claims based on the same conduct. *Id.*

It would appear that this exception applies in this case. Each charge alleges virtually identical violations of the FCRA and Title VII, and are based on the same conduct alleged by Garrett. In addition, each of the former class member charges

---

**15.** Although the DOC contends that the charge filed on January 9, 2002 was untimely, Garrett has provided unchallenged evidence that it was filed within the 365 day limit for the FCRA.

**16.** *See* FCHR Discrimination Charges (Doc. 48–2).

**17.** *See* Third Amended Complaint, ¶ 13.

stated that the conduct was continuous, that the DOC has engaged in a "pattern and practice" of harassment throughout all of its facilities, and requested class treatment. Thus, the DOC and the EEOC and FCHR were put on notice that there would be later-arising claims challenging the same actions. *See Stone v. First Union Corp.,* 203 F.R.D. 532 (S.D.Fla.2001); *see also Alexander v. Fulton County, Ga.,* 207 F.3d 1303 (11th Cir.2000). Further proof of this is the fact that the FCHR treated Garrett's November 29, 2006 charge as relating back to the former class members' August 2001 charges.[18]

Garrett also correctly points out that even if the "piggybacking" rule did not apply in her case, her November 29, 2006 charge would still be found timely under the tolling principles applied to class actions. *Armstrong v. Martin Marietta Corp.,* 138 F.3d 1374 (11th Cir.1998); *Griffin v. Singletary,* 17 F.3d 356 (11th Cir. 1994). Summary judgment on this basis is due to be denied.

### III. Damages

■ The last argument by the DOC in favor of summary judgment focuses on Garrett's claimed damages. According to the DOC, Garrett has none. Although Garrett testified at her deposition that she felt demeaned and angry, and that she suffered from bouts of diarrhea, the DOC contends that this is not a sufficient basis for "awardable damages."[19] Because Garrett has not alleged any recoverable damages, the DOC requests judgment in its favor.

■ In response, Garrett correctly points out that general compensatory dam-

ages need not be proven with a high degree of specificity, but "may be inferred from the circumstances as well as proved by the testimony." *Ferrill v. The Parker Group,* 168 F.3d 468, 476 (11th Cir.1999) (quoting *Carey v. Piphus,* 435 U.S. 247, 263–64, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)); *see also Akouri v. State of Florida Dept. Of Transp.,* 408 F.3d 1338, 1345 (11th Cir.2005). A plaintiff need not proffer expert testimony concerning her pain or suffering, rather, her own testimony concerning her humiliation can be sufficient. *Id. See also Marable v. Walker,* 704 F.2d 1219, 1220 (11th Cir.1983) (holding that plaintiff's own testimony that he was embarrassed and humiliated was sufficient to support compensatory damages award). The fact that Garrett has not provided any evidence at this stage concerning her damages, and does not appear any longer to be seeking damages for lost income, does not mean she has no right to damages at all. "Any evidentiary shortcomings 'go more to the amount, rather than the fact, of damage.'" *Ferrill,* 168 F.3d at 476 (quoting *Marable,* 704 F.2d at 1220). Summary judgment is therefore not appropriate on this basis.

### CONCLUSION

Accordingly, upon due consideration, it is hereby ORDERED and ADJUDGED that the Defendants' Amended Motion for Summary Judgment (Doc. 12) is GRANTED IN PART AND DENIED IN PART. All requests by the Plaintiff for injunctive, declaratory, and/or other equitable relief are DENIED. In all other respects the Defendants' motion is denied, and the Plaintiff may proceed with her hostile

---

18. *See* January 31, 2007 Letter from Florida Commission on Human Relations to Jean Garrett. (Doc. 51).

19. The DOC has not submitted any binding legal authority for this proposition.

work environment claims under Title VII and the FCRA. Judgment will be withheld pending resolution of the case as a whole.

IT IS SO ORDERED.