[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-11540

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 07, 2010
JOHN LEY
CLERK

D. C. Docket No. 06-14324-CV-JEM

MELANIE BECKFORD,
CHARLENE FONTNEAU,
TITA DE LA CRUZ,
LEE WASCHER,
LINDA JONES, et al.,

Plaintiffs-Appellees,

versus

DEPARTMENT OF CORRECTIONS,

Defendant-Appellant.

_____

No. 09-14903

_____

D. C. Docket No. 06-14324-CV-JEM

MELANIE BECKFORD,
CHARLENE FONTNEAU,
TITA DE LA CRUZ,
LEE WASCHER,
LINDA JONES, et al.,

Plaintiffs-Appellees,

versus

DEPARTMENT OF CORRECTIONS,
STATE OF FLORIDA,

                                                    Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(May 7, 2010)

Before PRYOR and FAY, Circuit Judges, and QUIST,[*] District Judge.

PRYOR, Circuit Judge:

This appeal presents the question whether the Florida Department of

Corrections can be liable, under Title VII of the Civil Rights Act of 1964, for

failing to remedy a sexually hostile work environment that male inmates created

for female employees at Martin Correctional Institution.  See 42 U.S.C.

§ 2000e–2(a)(1).  Melanie Beckford and 13 other women, all former non-security

employees at Martin, complained that the Department failed to remedy sexually

offensive conduct of inmates, including the frequent use of gender-specific abusive

language and pervasive "gunning," the notorious practice of inmates openly

_____

[*] Honorable Gordon J. Quist, United States District Judge for the Western District of
Michigan, sitting by designation.

2

masturbating toward female staff. At trial, a jury heard evidence of this harassment, considered the ability of the Department to mitigate the misconduct, and held the Department liable. On appeal, the Department presents four arguments: (1) the Department, as a matter of law, cannot be liable under Title VII unless its staff actively encouraged or participated in the harassment; (2) the female employees failed to prove that the inmates' harassment was because of sex; (3) the district court should have instructed the jury about the affirmative defense recognized in Faragher v. City of Boca Raton, 524 U.S. 775, 807–08, 118 S. Ct. 2275, 2292–93 (1998); and (4) the district court should have severed the employees' claims under Federal Rule of Civil Procedure 42(b). We conclude that the jury was entitled to find the Department liable under Title VII because it unreasonably failed to remedy the sexual harassment by its inmates. We also reject the other arguments of the Department and affirm.

## I. BACKGROUND

Beckford and the 13 other former employees worked at Martin between 1999 and 2002. Beckford, Susan Black, Tita De la Cruz, Charlene Fontneau, Linda Jones, Paula LaCroix, Joyce Meyer, Donna Pixley, Vesna Poirier, Michelle Pollock, Lourdes Silvagnoli, and Lee Wascher worked as nurses; Sushma Parekh worked as a physician; and Janet Smith worked as a classification officer. Each of

3

the female employees worked in the "close management" housing dorms at Martin. The nurses entered the close management dorms each day to pass medication to inmates, answer sick calls, and respond to medical emergencies. The other former employees entered the close management dorms at least several times each week to perform similar duties or to discuss administrative matters with inmates.

According to James Upchurch, the director of security operations for the Department, the close management dorms house inmates who "have demonstrated by their behavior and the pattern of their behavior that they can't be left in the general population because they pose too great a threat" to other inmates and staff. Martin houses close management inmates in several separate dorms. Each dorm comprises four quads, which contain individual inmate cells. Each single cell contains a bunk, sink, and toilet and has a solid door with a glass window. Each cell door contains a slot through which prison staff pass medication and food. Each close management dorm also contains a glass control room or bubble that sits in the middle of the dorm and provides staff a view of the quads. From the bubbles, staff can view each cell in a dorm.

While the women were employed at Martin, the close management inmates abused staff, especially female staff. David Harris, who served as assistant warden at Martin during the 1990s, testified that close management "inmates would throw

4

urine, throw feces on [male security] staff." Sergeant Brian McDew, who worked as a corrections officer at Martin during the same period, testified that this behavior toward male staff did not happen "very often, but it happen[ed]." According to the testimony of the female employees, the inmates reacted especially poorly to the presence of female staff in the close management dorms. When the inmates saw female employees approaching one of the close management dorms, the inmates called the employees names—including cunt, whore, slut, and bitch—through the exterior cell windows and explained, in graphic detail, the sexual liberties that the inmates would take with the employees, if given the opportunity.

The inmates often instructed each other to "lock and load" when they saw female staff approaching one of the dorms. The inmates' phrase "lock and load" referred to the most notorious conduct to which they exposed the female staff: gunning. That conduct involved exposing themselves and masturbating directly at staff.

The female employees testified to similar experiences. They testified that inmates gunned them from the inmates' cells while the female employees were waiting in the close management dorm bubbles before working in the quads. To harass the women waiting in the bubbles, the inmates would stand, a nurse testified, "at their windows, hanging off the door jambs, standing on the toilets, on

5

rolled up mattresses" so that the female employees could see the inmates gunning through the cell windows. The inmates often would ejaculate on the cell windows and through the food slot or flap on the cell door, sometimes when female staff were standing at the door. The inmates masturbated when the female employees were completing paperwork in the dorms, and when the women saw inmates in the isolation room in the medical building.

The inmates also gunned the female employees when the women responded to medical emergencies in the close management dorms. Nurse Poirier testified that "99.9 percent of the time the emergencies were bogus. It was just for me to get down there for [the inmates] to have the entertainment for the evening." Nurse Fontneau explained that the inmates faked emergencies and they "call[ed] because it was like hiring a call girl or a whore." Nurse Pixley recalled an incident in which a male nurse responded to an emergency in a close management dorm. She testified that the male nurse "was back within five minutes because . . . the inmate cussed him out and said that he didn't need medical. . . . [The inmate] asked him where is the female nurse."

Each of the female employees testified about her own humiliating experiences with gunning. Nurse Meyer, for example, recalled being abandoned by a male security employee, Lieutenant Ferguson, while she was delivering

6

medication in a close management dorm. When Nurse Meyer was alone, "the inmates in the quad all started to scream and bang on the doors." "[T]hey were hanging onto the door frames above the door and they were on their toilet and they were all masturbating." Nurse Meyer estimated that "it was probably 15 inmates that they were ejaculating and everything on the windows." Lieutenant Ferguson "totally ignored" Nurse Meyer's calls for help, and when she confronted him later about the episode, he said, "'[Y]ou were looking for it. I saw you, you were looking for it. You were asking for it.'" Nurse Meyer was scheduled to leave the Department at the end of that day, but she quit on the spot.

Gunning was a frequent phenomenon. At trial, the female employees estimated that when they were in the close management dorms, virtually "every one of" the inmates gunned. Nurse Beckford testified that the inmates used a "team effort" for gunning the female employees, and Nurse Jones described the inmates' behavior as a "chain reaction." The employees also presented evidence that virtually all the inmates participated in the misconduct and the inmates gunned only female staff, not the all-male security staff.

The female employees attempted to limit their exposure to inmate gunning. The employees tried to place screens in front of the windows of the isolation rooms and suggested papering cell door windows, but security personnel did not permit

7

those measures. The employees also suggested two-way mirrors for the nursing stations, but management rejected that idea as too expensive. The employees suggested that inmates be brought to the medical building so that the employees would not have to visit the dorms or that inmates be brought to a separate room in the close management dorms, but prison officials determined that staff shortages prevented these measures. The employees also suggested the use of pink uniforms to shame repeat gunners. Some of the employees wore baggy clothes; neck towels to disguise sweat, which inmates enjoyed seeing; sunglasses to avoid eye contact with inmates; and headphones to avoid the verbal harassment. It is unclear how successful these last measures were, as they sometimes generated additional harassment.

The female employees complained to prison management, including the warden, about the conduct of the inmates. The employees testified that they filed disciplinary reports regarding inmate harassment, including gunning. Several female employees testified that management ordinarily ignored these complaints. Captain Wiles, for example, once informed a complaining nurse that the inmates were in "their living room and they could do whatever they wanted." Male employees encouraged the female employees to accept the gunning "as a compliment." Other female employees testified that prison officials sometimes

8

punished inmates in response to the employees' complaints of harassment. The female employees also presented evidence that management discouraged the nursing staff from filing disciplinary reports. In a formal memorandum circulated to the staff, Dr. David Thomas, the director of health services, explained that "it is far more appropriate for correctional officers and non-health services employees to do discipline reports and other forms of punishment."

The Department maintained a sexual harassment policy, but the female employees testified that they understood the policy to cover only harassment by other employees and outside vendors who transacted with the Department, not inmates. At trial, the Equal Employment Opportunity investigator for the Department, Debbie Dawson, agreed that the policy, as explained to the female employees, did not cover harassment by inmates. Dawson also testified that, if the policy had covered harassment by inmates, the employees had fully satisfied the reporting requirements of the policy by complaining to prison management, the Florida Commission on Human Relations, and the Equal Employment Opportunity Commission.

Eventually, the warden met with several female employees to discuss the harassment. After the meeting, the Department adopted a new "three minute rule," which permitted employees to refuse service to an inmate who gunned the

9

employees for more than three minutes. A nurse testified that, after the adoption of the new rule, the gunning "got worse because the inmates knew they had three minutes and they used to say 'you can't refuse me, you got to wait.'" Another employee testified that the rule led the inmates to believe that "[t]hey ran the facilities."

In 2001, the former employees in this appeal and others sued the Department in a Florida court. The female employees alleged that the Department violated state law by creating a hostile work environment and successfully sought class certification. In March 2006, the employees amended their complaint to add a claim under Title VII.

The Department removed the case to the Northern District of Florida, which later decertified the class and transferred the claims before us to the Southern District of Florida. Before trial, the Department moved to sever the employees' claims under either Federal Rule of Civil Procedure 21 or Rule 42(b), but the district court denied that motion. The district court weighed the prejudice of a single trial against the costs of severance and ruled that joinder of the claims was warranted.

At trial, the Department asked the district court to instruct the jury on its Faragher affirmative defense, but the district court refused. The district court

10

explained that "the Faragher defense seems to me to be much more involved with supervisors and supervision and this is not that." The district court instructed the jury to determine, "by looking at all the circumstances," whether the plaintiffs proved, by a preponderance of the evidence, that the employment environment at Martin was "hostile or abusive." The district court further explained that "[i]f you determine that a particular plaintiff was in fact subject to a hostile or abusive work environment, you must then determine whether her employer created or permitted that hostile and abusive work environment." The district court explained that the "Department of Corrections created or permitted a hostile or abusive work environment only if the department . . . failed to take corrective action reasonabl[y] calculated to address the inmate misconduct." When determining whether the corrective action was reasonable, the jury was instructed to consider "the Department of Corrections' ability to stop or mitigate the misconduct." The district court required the jury to answer a special interogatory for each verdict that asked whether the employees proved that the "defendant failed to exercise reasonable care to prevent and correct promptly any sexually harassing behavior in the workplace." The jury returned a verdict against the Department and awarded each employee $45,000 in damages.

The Department moved for judgment notwithstanding the verdict and,

11

alternatively, for a new trial. The Department argued that it could not be liable for harassment by inmates unless Department employees encouraged or participated in the conduct and that the female employees had not proved employee encouragement or participation. The Department also argued that none of the harassment by inmates was based on sex and that the Department was entitled to judgment as a matter of law on the Faragher defense. The Department again contended that the district court should have instructed the jury on the Faragher defense. The district court denied the motion.

## II. STANDARDS OF REVIEW

Three standards of review govern this appeal. We review de novo the decision to deny the Department judgment as a matter of law. Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1289 (11th Cir. 1998). We will render judgment for the Department if "there is no legally sufficient evidentiary basis for a reasonable jury to find for" the plaintiff employees. Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1192 (11th Cir. 2004); see also Fed. R. Civ. P. 50. "We review a district court's refusal to give a particular jury instruction for abuse of discretion." United States v. Yeager, 331 F.3d 1216, 1222 (11th Cir. 2003) (internal quotation marks omitted). The failure of a district court to give an appropriate instruction is reversible error where the "requested instruction (1) was

12

correct; (2) was not substantially covered by the charge actually given; and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." Id. at 1222–23 (internal quotation marks omitted). "[W]e disturb a district court's decision not to order separate trials only upon a showing of abuse of discretion." Alexander v. Fulton County, 207 F.3d 1303, 1325 (11th Cir. 2000).

### III.  DISCUSSION

We divide our discussion in four parts.  First, we explain that the jury was entitled to find the Department liable for a hostile work environment because the Department unreasonably failed to remedy the harassment.  Second, we explain that the jury was entitled to find that the harassment of female staff by inmates was based on sex.  Third, we explain that the Department was not entitled to have the jury instructed about the Faragher defense.  Fourth, we explain that the district court did not abuse its discretion when it refused to sever the individual employees' claims under Rule 42(b).

*A.  The Department Can Be Liable for Sexual Harassment by Inmates.*

The Department argues that, as a matter of law, a prison cannot be held liable for sexual harassment by its inmates unless its employees participate in or encourage the harassment.  Although the Department acknowledges that ordinarily

13

employers can be held liable for unreasonably failing to remedy harassment of employees by third parties, the Department argues that "[p]rison officials should be treated different from other employers." We disagree.

It is well established that employers may be liable for failing to remedy the harassment of employees by third parties who create a hostile work environment. In Watson v. Blue Circle, Inc., we held that an "employer may be found liable for the harassing conduct of its customers if the employer fails to take immediate and appropriate corrective action in response to a hostile work environment of which the employer knew or reasonably should have known." 324 F.3d 1252, 1258 n.2 (11th Cir. 2003). Uniformly, our sister circuits have applied the same rule that employers may be held liable under Title VII for harassment by third parties when that conduct creates a hostile work environment. See, e.g., Erickson v. Wis. Dep't of Corr., 469 F.3d 600, 605 (7th Cir. 2006); Galdamez v. Potter, 415 F.3d 1015, 1022 (9th Cir. 2005); Turnbull v. Topeka State Hosp., 255 F.3d 1238, 1244 (10th Cir. 2001); Weston v. Pennsylvania, 251 F.3d 420, 427 (3d Cir. 2001); Slayton v. Ohio Dep't of Youth Servs., 206 F.3d 669, 677 (6th Cir. 2000); Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1073–74 (10th Cir. 1998); Rodriguez-Hernandez v. Miranda-Velez, 132 F.3d 848, 854 (1st Cir. 1998); Crist v. Focus Homes, Inc., 122 F.3d 1107, 1108 (8th Cir. 1997); see also Noah D. Zatz, Managing the Macaw:

<u>Third-Party Harassers, Accommodation, and the Disaggregation of Discriminatory Intent</u>, 109 Colum. L. Rev. 1357, 1372–73 (2009).

In defense of that rule, Judge Easterbrook wrote, "Because liability is direct rather than derivative, it makes no difference whether the person whose acts are complained of is an employee, an independent contractor, or for that matter a customer. Ability to 'control' the actor plays no role." <u>Dunn v. Wash. County Hosp.</u>, 429 F.3d 689, 691 (7th Cir. 2005). Judge Easterbrook explained that employees are not pawns whose conduct uniquely subjects an employer to liability for their harassment of another employee while the employer is absolved of any liability for the conduct of third-party harassers: "Employees are not puppets on strings; employers have an arsenal of incentives and sanctions (including discharge) that can be applied to affect conduct. It is the use [of] (or failure to use) these options that makes an employer responsible—and in this respect [third parties] are no different from employees. " <u>Id.</u> To illustrate this point, Judge Easterbrook famously used the colorful analogy of managing a macaw:

> Indeed, it makes no difference whether the actor is human. Suppose a patient kept a macaw in his room, that the bird bit and scratched women but not men, and that the Hospital did nothing. The Hospital would be responsible for the decision to expose women to the working conditions affected by the macaw, even though the bird (a) was not an employee, and (b) could not be controlled by reasoning or sanctions. It would be the Hospital's responsibility to protect its female employees by excluding the offending bird from its premises.

Id. A prison certainly has a larger arsenal of incentives and sanctions that would allow it to manage more rational beings like inmates than a hospital would have at its disposal to manage a macaw.

We refuse the invitation of the Department to treat inmates differently from other third-party harassers and prisons differently from other employers under Title VII. Several of our sister circuits have refused this invitation too and permitted liability for sexual harassment by inmates. See Erickson, 469 F.3d at 605–06; Freitag v. Ayers, 468 F.3d 528, 538–39 (9th Cir. 2006); Weston, 251 F.3d at 427; Slayton, 206 F.3d at 677; see also Garrett v. Dep't of Corr., 589 F. Supp. 2d 1289, 1297–98 (M.D. Fla. 2007). Like them, we reject the notion that "prisons are uniquely exempt from liability for sexual harassment under Title VII." Freitag, 468 F.3d at 539. We agree that "[n]othing in the law suggests that prison officials may ignore sexually hostile conduct and refrain from taking corrective actions that would safeguard the rights of the victims, whether they be [employees] or inmates." Id.

Contrary to the argument of the Department, Bell v. Wolfish, 441 U.S. 520, 99 S. Ct. 1861 (1979), and similar precedents do not require that we exempt prisons from the requirements of Title VII. These authorities instead reconcile the competing demands of officials to maintain control of prisons and respect the

16

constitutional rights of prisoners and pretrial detainees.  <u>Id.</u> at 547–48, 99 S. Ct. at 1878–79.  <u>Bell</u> and similar precedents about the deference owed to prison officials in their control of inmates do not exempt prison officials from liability under Title VII when the source of harassment or discrimination of employees is inmates.

Our general rule of reasonableness regarding employer liability for third-party harassment under Title VII adequately respects the difficulties that prison officials encounter in controlling inmate conduct.  Title VII does not require, on the one hand, that prisons prevent all manner of harassment at all cost and without regard to important penological interests.  We recognize that there are practical and constitutional limits on what prisons can do to protect staff.  Prisons cannot, for example, eject unruly inmates like businesses can eject rude customers.  <u>Cf.</u> <u>Dunn</u>, 429 F.3d at 691.  The Eighth Amendment also limits the sanctions that prisons can impose on abusive inmates, probably even inmates who create a sexually hostile work environment for prison employees.  <u>Cf.</u> <u>Ricci v. DeStefano</u>, 557 U.S. - - , 129 S. Ct. 2658, 2682 (2009) (Scalia, J., concurring).  Although some harassment by inmates cannot be reasonably avoided, the Department, on the other hand, cannot refuse to adopt reasonable measures to curtail harassment by inmates.

The district court correctly applied the standard of reasonableness that governs employers under Title VII.  The district court instructed the jury that "[i]f

17

you determine that a particular plaintiff was in fact subject to a hostile or abusive work environment, you must then determine whether her employer created or permitted that hostile and abusive work environment." The district court explained that the "Department of Corrections created or permitted a hostile or abusive work environment only if the department . . . failed to take corrective action reasonabl[y] calculated to address the inmate misconduct." The district court instructed that, in considering whether the corrective action was reasonable, the jury should consider "the Department of Corrections' ability to stop or mitigate the misconduct." The district court also required the jury to answer a special interrogatory for each verdict that asked whether "the defendant failed to exercise reasonable care to prevent and correct promptly any sexually harassing behavior in the workplace."

At oral argument, the Department conceded that sufficient evidence entitled the jury to find that the Department unreasonably failed to remedy the harassment by the inmates, and we agree. A reasonable jury could have found that prison officials should have enforced the inmate dress policy, which required inmates to wear pants when female staff were in the close management dorms. According to an expert who testified at trial, enforcing this rule would have "discourage[d] th[e] gunning masturbation." A reasonable jury also could have found that security personnel should have accompanied female staff while they were in the close

18

management dorms. A reasonable jury could have found that the Department should have required security officers to write disciplinary reports or permitted the female staff to report the misconduct of inmates. See Freitag, 468 F.3d at 541; Garrett, 589 F. Supp. 2d at 1292. Moreover, a reasonable jury could have found that prison administrators should have permitted the nurses to use screens at cell windows and in the bubble to prevent harassment. Freitag, 468 F.3d at 540–41; Garrett, 589 F. Supp. 2d at 1292–93. A reasonable jury also could have found that the prison should have treated masturbation toward female staff as the Department treated abuse of the all-male security staff and referred the incidents for outside prosecution. Freitag, 468 F.3d at 541 & n.6. A reasonable jury also could have found that the Department should have adopted a specific anti-gunning policy. Id. at 541; Garrett, 589 F. Supp. 2d at 1298.

The Department could reasonably have done any or all of these things to protect the employees at Martin. The Department instead sought a blanket exemption from an established requirement of Title VII. That strategy was misguided.

### B. The Harassment of Employees by Inmates Was Based on Sex.

Our recent en banc opinion in Reeves v. C.H. Robinson Worldwide, Inc., forecloses the alternative argument of the Department that no reasonable jury could

have found that the conduct of the inmates was based on sex. 594 F.3d 798 (11th Cir. 2010) (en banc). The Department contends that the "inmates in close management confinement [were] equal opportunity harassers" and that the women "chose to work in a correctional facility that houses close management inmates [and] made a choice to work in an environment with the 'worst of the worst,'" but these arguments fail. That the close management inmates are typically crude and even obscene does not mean that their harassment was indiscriminate. Id. at 810. The employees presented evidence that the inmates called them cunts, whores, bitches, and sluts, and we have ruled that these gender-specific and highly offensive epithets evidence sex-based harassment under Title VII. Id. The female employees also presented evidence that the inmates gunned only female staff, Garrett, 589 F. Supp. 2d at 1292 n.3, and, not surprisingly, our sister circuits agree that exhibitionist masturbation, especially gunning, is sex based and highly offensive conduct. See, e.g., Freitag, 468 F.3d at 540; see also Garrett, 589 F. Supp. 2d at 1298–99.

Title VII required the Department to adopt reasonable remedial measures to protect its female employees from the sexually hostile environment that the inmates created. The jury was entitled to find that the Department made almost no effort to protect its employees from this sex-based harassment. This record entitled

the jury to find the Department liable under Title VII.

   *C. The District Court Did Not Err in Rejecting the* Faragher *Instruction.*

   The Department argues that the district court should have instructed the jury about the affirmative defense that the Supreme Court articulated in Faragher, 524 U.S. at 807–08, 118 S. Ct. at 2292–93. According to the Department, the district court should have instructed the jury that it could return a verdict in favor of the Department if the jury found, by a preponderance of the evidence, that the Department exercised reasonable care to prevent or promptly correct any sexual harassment and the employees unreasonably failed to take advantage of any preventive or corrective opportunities provided. This argument fails for two reasons.

   We agree with the district court that the Faragher defense was not available to the Department. By its own terms, the Faragher defense is available to employers who defend against complaints of "an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the [plaintiff] employee." Id. at 807, 118 S. Ct. at 2293 (emphasis added). When, as here, employees complain of harassment by someone other than a supervisor, the Faragher defense does not apply. "One standard exists for harassment by supervisors and another for harassment by coworkers" and third parties. Erickson,

21

469 F.3d at 604. The district court did not abuse its discretion when it instructed the jury consistent with our precedent, see Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1278 (11th Cir. 2002); see also Dunn, 429 F.3d at 691, and refused to give the instruction that the Department requested.

Alternatively, the refusal of the district court to instruct the jury about the Faragher defense did not prejudice the Department. If it had received its requested instruction, the Department could have avoided liability if it had proved, by a preponderance of the evidence, that it had taken reasonable preventive or corrective measures to address the harassment by the inmates, see Faragher, 524 U.S. at 807, 118 S. Ct. at 2293, but we know that the jury would not have found for the Department on that issue. The jury answered "yes" to special interrogatories that asked whether the Department "failed to exercise reasonable care to prevent and correct promptly any sexually harassing behavior in the workplace." The "affirmative answer[s] to the[se] . . . interrogator[ies] indicat[e], without doubt," how the jury would have found on a necessary element of the Faragher defense, and render any error in refusing the instruction of the Department harmless. Bogle v. McClure, 332 F.3d 1347, 1357–58 (11th Cir. 2003).

D. *The District Court Did Not Abuse Its Discretion When It Refused to Sever the Employees' Claims Under Rule 42(b).*

The Department concedes that Rule 20(a) permitted the district court to join

22

the individual employees' claims, but argues that the district court should have severed the claims under Rule 42(b) and ordered separate trials "to avoid prejudice" to the Department. See Fed. R. Civ. P. 42(b). The Department contends that it "suffered prejudice by the large number of claims, the sheer volume of information, and the inflammatory nature of the allegations." The Department recognizes the "practical burdens that could result from conducting fourteen separate trials as opposed to a single large trial," but maintains that "such burdens, if they manifest, cannot take precedence over the administration of justice and the right of the [Department] to a fair trial."

At least four considerations persuade us that, on "the peculiar facts and circumstances of [this] case," the district court did not abuse its discretion. Alexander, 207 F.3d at 1325. First, this litigation involved 14 plaintiffs, and we have affirmed refusals to sever that involved more plaintiffs. See id. (affirming refusal to sever in employment discrimination action involving 18 plaintiffs). Second, "in this case the potential for prejudice was minimized because of the core similarities" in the female employees' claims. Id. Each employee sought to prove that inmates repeatedly gunned and verbally abused female employees, the Department knew of this gunning and harassment, the Department reasonably could have prevented or remedied this behavior, and the Department did not

23

respond to the harassment in ways that it reasonably could have.  The defense of the Department, as it was explained to the district court and presented at trial, did not differ from claim to claim.  Third, the district court was understandably concerned about delaying this litigation, which had been wending its way through state and federal court for more than five years, and "economy[ and] expedition" are relevant considerations under Rule 42(b).  Id.  Fourth, the district court sensibly considered that another district court had recently tried, successfully and in only five days, a nearly identical set of actions involving 12 female prison employees.  The Department argues that "the volatile nature of the allegation[s] warranted severance," but severance would not have changed the highly incendiary nature of the inmates' conduct or the employees' allegations.  In the light of our precedents, we cannot say that the district court abused its discretion in trying these claims together.

## IV.  CONCLUSION

The judgment of the district court is **AFFIRMED**.