REEVES, District Judge,
concurring in part and dissenting in part:
I agree that Lillie Wheat’s retaliatory termination claim should proceed to trial, *712 while her sexual harassment claim cannot survive summary judgment. Despite my agreement with much of the opinion, the majority errs when it finds no prima facie case of pre-termination retaliation. To reach that conclusion, the majority has to: (1) disregard record evidence, and (2) ignore the defendant’s concession in the district court that Wheat had made out such a prima facie case. I therefore must respectfully dissent.
I.
When a person sues her former employer and succeeds, she may not be welcomed back with open arms. Embarrassing facts may have been unearthed during the litigation; enemies may have been made. Facing scorn upon return is not itself retaliation, true — but it is only natural for an employee to be alert to the possibility. Retaliation still happens in this day and age. See, e.g., Brown v. Mississippi Dep’t of Health, 256 Fed.Appx. 710 (5th Cir. 2007) (affirming jury verdict finding that the Mississippi Department of Health racially discriminated against Albert Brown); Brown v. Mississippi Dep’t of Health, 550 Fed.Appx. 228 (5th Cir.2018) (affirming jury verdict finding that the Mississippi Department of Health retaliated against Brown because he had prevailed in his earlier racial discrimination suit).
Wheat was an Assistant Director at the Florida Parishes Juvenile Detention Center (FPJDC). After years of dutiful service, she was fired while on FMLA leave and had to seek judicial relief to get her job back. Wheat reached an amicable settlement and returned to work. Upon her return, though, FPJDC assigned Wheat to janitorial duties for three weeks.
That’s retaliation as a matter of common sense. I recognize that there is not always a perfect overlap between common sense and the law, but in this case they are one and the same. In other words, common sense tells me that the reassignment was obvious retaliation, and the rules of procedure instruct that the issue should be resolved by a jury.
II.
The majority begins with an “important” reminder: FPJDC is a correctional institution “primarily for youths who are emotionally challenged, exhibit drug and alcohol problems, mental problems, and suicidal tendencies.” Op. at 705. The description comes from the affidavit of Steven Happel, FPJDC’s Director of Administration.
I personally find this description unfortunate. “Emotionally challenged” is not a clinical diagnosis. “Suicidal tendencies” probably should have read “suicidal ideation.” And claiming that these children have “mental problems” is hopelessly vague if not outright offensive.
FPJDC is a typical juvenile detention center, not a specialized treatment facility. Like other juvenile detention centers, it houses a variety of children. Some have committed criminal offenses. Others are victims of violence seeking refuge. And quite a few shouldn’t be there in the first place — especially those who face no criminal charges. See N.G. v. Connecticut, 382 F.3d 225, 239 (2d Cir.2004) (Sotomayor, J., concurring in part and dissenting in part) (describing the “troubled adolescent girls facing no criminal charges” who were detained and subjected to squat-and-cough strip searches).
The truth is that kids are detained in juvenile detention centers for all kinds of behavior. Hundreds of thousands of children run away from home after suffering sexual or physical abuse. Lois A. Weit-horn, Envisioning Second-Order Change in America’s Responses to Troubled and *713 Troublesome Youth, 33 Hofstra L.Rev. 1305, 1379 (2005). Yet hundreds of thousands of these “status offenders” wind up in juvenile detention centers each year.[1] Patricia J. Arthur & Regina Waugh, Status Offenses and the Juvenile Justice and Delinquency Prevention Act: The Exception That Swallowed the Rule, 7 Seattle J. for Soc. Just. 555, 555-56 (2009). Children have even been arrested for minor schoolhouse disciplinary infractions including “texting, passing gas in class, violating the school dress code, stealing two dollars from a classmate, bringing a cell phone to class, arriving late to school, or telling classmates waiting in the school lunch line that he would ‘get them’ if they ate all of the potatoes.” Jason P. Nance, Students, Police, and the Schooh-to-Prison Pipeline, — Wash. U.L.Rev. -, at *5-6 (last rev’d Nov. 2, 2015), http://papers.ssrn.com/ sol3/papers.cfm?abstract_id=2577333.[2] Vague claims that they have “mental problems” therefore says little about the children.
Still, as Judge, my duty is to set aside my personal views and examine the evidence. At the summary judgment stage in particular, Judges “do not weigh the evidence, assess its probative value, or resolve any factual disputes.” Aubrey v. Sch. Bd. of Lafayette Par., 92 F.3d 316, 318 (5th Cir.1996).
In this case, my duty requires me to acknowledge that the majority’s description of FPJDC is accurately drawn from competent summary judgment evidence: Happel’s affidavit.
In her summary judgment response, Wheat (through counsel) argued generally that Happel’s characterization was ambiguous and irrelevant. A more specific objection may have had some merit at trial, but Wheat failed to submit evidence contradicting this portion of Happel’s affidavit.[3] As a result, the only evidence on this point is from Happel, and the majority is justified in relying upon it in the opinion.
III.
I described the above only because the majority has not given the same deference to Wheat’s evidence of pre-termination retaliation.
First, the majority errs by disregarding Wheat’s sworn declaration that she “was initially assigned to perform janitorial work and do intake” upon her return to work. That too is evidence. See Fed. R.Civ.P. 56(c)(1)(A) (listing declarations as competent summary judgment evidence). The majority’s assertions that the declaration was merely “an allegation,” a “bare-bones allegation,” “an unsupported eonclu-sory claim,” and “a bare allegation” are incorrect as a matter of law. Op. at 707. There is no justification for discounting this evidence.
The majority’s error is compounded when it concludes that janitorial duties are not materially adverse. My colleague has defined materially adverse as something *714 which inherently causes harm to an employee. Halliburton Co. v. Admin. Review Bd., 596 Fed.Appx. 340, 341 (5th Cir. 2015) (Jolly, J., dissenting from the denial of rehearing en banc). In other words, something is materially adverse when “the negative effect on the employee is clear.” Id.
Common sense suggests that a downward reassignment to janitorial duties has a clear negative effect on the employee. The plain meaning of janitor is someone who cleans up after others. See, e.g., Webster’s Third New International Dictionary 1209 (1993) (defining janitor as “one that keeps the premises of an apartment, office, or other building clean and free of refuse”). Janitors sweep. They dust. They mop. They pick up and take out the trash. They clean up messes others make by accident or by slothfulness. The unfortunate contradiction inherent in their jobs, like so many jobs today, is that they perform essential functions for other professionals yet receive low pay, have little status, and are too-often invisible.[4] ■ It would be a demotion for anyone not hired as a janitor to be reassigned to janitorial duties.
If plain meaning is not enough, decisions from the Supreme Court and two courts of appeal, including this one, support the conclusion that reassignment to janitorial duties is materially adverse.
In Burlington Northern, the Supreme Court held that a job reassignment is materially adverse when it involves “dirtier” work, has less “prestige,” and is objectively considered a worse job. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 71, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). The majority opinion quotes these criteria but applies them in the exact wrong way. If reassignment to janitorial tasks — dirtier, less prestigious, and worse than other duties — does not satisfy Burlington Northern, what would?
This very Court has found that reassignment to janitorial duties is materially adverse. In Wilson v. Monarch Paper Company, a former Vice President won a $3.4 million jury verdict after he was reassigned to perform “housekeeping chores,” sweeping, and cafeteria cleanup. 939 F.2d 1138, 1145 (5th Cir.1991). In affirming, my colleague described those chores as “extreme and outrageous” retaliation. Id. He added,
We find it difficult to conceive a workplace scenario more painful and embarrassing than an executive, indeed a vice-president and the assistant to the president, being subjected before his fellow employees to the most menial janitorial services and duties of cleaning up after entry level employees: the steep downhill push to total humiliation was complete.
Id. That holds true even when non-executives are reassigned to janitorial duties. See Hoyle v. Freightliner, LLC, 650 F.3d 321, 337 (4th Cir.2011) (concluding at summary judgment that truck assembler’s reassignment from her regular position to unspecified janitorial duties was materially adverse).
The majority endeavors mightily to distinguish our case from Wilson.[5] It has *715 convinced me of only two salient distinctions.
The first — and the elephant in the room — is that this Court refused to allow a white-collar corporate executive to be reassigned to janitorial duties, but will allow a blue-collar correctional officer to be reassigned to those duties. Why that makes sense in a system predicated upon equal justice under law is beyond me.[6] “In my conscientious view, the Court should ... mete out employee rights on the same standard to all.” Halliburton, 596 Fed.Appx. at 342 (Jolly, J., dissenting from the denial of rehearing en banc); see also Thompson v. City of Waco, Tex., 779 F.3d 343, 345 (5th Cir.2015) (Jolly, J., dissenting from the denial of rehearing en banc) (complaining that “a particular panel can find language, and indeed even legal principles, that likely will support any conclusion that it may reach” as to whether an adverse employment action has occurred).
The second distinction is that Wilson presented evidence to a jury about the extent and nature of his janitorial duties, while Wheat has not yet had that opportunity. But the reason for this is obvious.
Wheat submitted evidence that she had been assigned janitorial duties, and argued that those duties were materially adverse. In response, FPJDC conceded for purposes of summary judgment “that the plaintiff has established her prima facie case with respect to her FMLA retaliation and Title VII gender discrimination claims.” While it moved on to argue that it had a legitimate reason for terminating Wheat and that Wheat had failed to show pretext — i.e., the second and third steps of the McDonnell Douglas analysis — it never complained of ambiguity or introduced counter-evidence on the specifics of Wheat’s janitorial duties.[7]
In other words, battle was not joined in the briefing or evidence over the materially adverse element the majority finds lacking today: the nature of Wheat’s janitorial “duties, time spent, or the humiliation, if any, that she suffered.” Op. at 708. The evidence that she performed those duties was conceded to the defendant’s satisfaction, and the plain meaning of what those duties entail — dirtier, less prestigious, and worse than' other tasks — went unchallenged.[8] Wheat simply had no duty to *716 detail the adversity inherent in her reassignment to janitorial duties.
From all this I conclude that the majority’s we-don’t-know-what-janitorial-duties-really-means argument cannot be considered on appeal because it was not made in the district court.[9] And it would be “gratuitous for the majority to aid [a party] with a ... theory of its own devising. Instead, we should consider the ... argument that [it] actually makes.” Mabary v. Home Town Bank, N.A., 771 F.3d 820, 828 (5th Cir.2014) (Jolly, J., dissenting), opinion withdrawn (Jan. 8, 2015); see also United States v. Pope, 452 F.3d 338, 351 n. 4 (5th Cir.2006) (Jolly, J., dissenting) (“an appeals court should not attempt to reliti-gate an issue forfeited below”), opinion withdrawn and superseded, 467 F.3d 912 (5th Cir.2006).
We need not debate the relative strength of Wheat’s evidence. As my colleague explained last year, in a case in which he found “feeble evidence,”
[w]e have recognized at the summary judgment stage that the nonmoving party need not reduce all its evidence to an admissible form. Although it appears to me that much of the evidence is currently vague and relies heavily on speculation, I believe the panel has exercised appropriate caution by remanding this case to proceed with a trial.
Roque v. Natchitoches Par. Sch. Bd., 583 Fed.Appx. 466, 471 (5th Cir.2014) (Jolly, J., concurring) (citation omitted). This sound advice should be applied here. Accord Hoyle, 650 F.3d at 334 (“[W]e have never held that a weak case is necessarily one that should be disposed of on summary judgment. The question at the summary judgment stage is not whether a jury is sure to find a verdict for the plaintiff; the question is whether a reasonable jury could rationally so find.”).
With respect, I cannot join Part III.A of the majority opinion.[10]
*717 IV.
A final word is owed on Wheat’s sexual harassment claim. As the majority correctly concludes, Wheat’s interactions with the alleged harasser did not objectively create a severe or pervasive hostile work environment.
At the same time, I do not think the majority suggests — and I would not agree if it had — that inmate-on-employee sexual harassment claims will always fail because correctional officers should expect severe or pervasive sexual advances as “ordinary terms and conditions” of their job. Op. at 711 n. 5 (quotation marks and citation omitted). That proposition is unsupported by case law. See Beckford v. Dep’t of Com, 605 F.3d 951, 953 (11th Cir.2010) (“We conclude that the jury was entitled to find the [Florida Department of Corrections] liable under Title VII because it unreasonably failed to remedy the sexual harassment by its inmates.”); Vajdl v. Mesabi Acad, of KidsPeace, Inc., 484 F.3d 546, 550 n. 2 (8th Cir.2007); Freitag v. Ayers, 468 F.3d 528, 538 (9th Cir.2006) (“the [California Department of Corrections and Rehabilitation’s] contention that it cannot, as a matter of law, be liable under Title VII for maintaining a hostile work environment caused by inmate misconduct ... is unsupported by the entire weight of case authority in this circuit and others”); Slayton v. Ohio Dep’t of Youth Servs., 206 F.3d 669, 679 (6th Cir.2000) (affirming liability on hostile work environment claim where, among other things, the supervisor “intentionally sent [the plaintiff, a correctional officer in a juvenile facility] to check on an inmate who was masturbating”).
Given the weight of these authorities, and the fact that the legal question is avoidable in this case, I would leave the issue for another day. See Valdiviez-Her-nandez v. Holder, 739 F.3d 184, 193 (5th Cir.2013) (Jolly, J., concurring) (“I can see no compelling reason to initiate a circuit split”).
For these reasons, I respectfully dissent in part.

. “Status offenders” include children who have run away, skipped school, or broken curfew, among other things. See Arthur & Waugh, 7 Seattle J. for Soc. Just, at 555.

. "The 'School-to-Prison Pipeline’ (STPP) refers to the framework of the United States school system that, by design, pushes students out of public schools through suspension or expulsion and into a juvenile detention facility or prison.” Matthew W. Burris, Mississippi and the School-to-Prison Pipeline, 3 Widener J.L., Econ. & Race 1, 2 (2011).

.In fact, Wheat is equally if not more qualified than Happel to describe the needs of the children in her care. She had worked at FPJDC longer than Happel, and had risen through the ranks as a line officer, Shift Supervisor, and then Assistant Director. But Wheat’s counsel failed to submit evidence from Wheat (or anyone else) on this point.

. In 2014, there were approximately 2,360,-600 janitors and building cleaners in America. Their median wage in May of that year was $10.98 an hour. Bureau of Labor Statistics, U.S. Department of Labor, Occupational Outlook Handbook, 2014-15 Edition, Janitors .and Building Cleaners, http://www.bls.gov/ ooh/building-and-grounds-cleaning/janitors- and-building-cleaners.htm (last visited Dec. 22, 2015).

. The majority has not attempted to distinguish our case from Hoyle.

. In Wilson, my colleague could not conceive a workplace scenario more painful and embarrassing than demotion to janitorial duties. It is difficult to reconcile those statements with today’s admonishment that Wheat should have explained (in her complaint no less) "why assignment to janitorial duties was an act of retaliation or an adverse employment action.” Op. at 708. It was just last year that the Supreme Court rebuked this court for insisting that a complaint contain such a "punctiliously stated theory of the pleadings.” Johnson v. City of Shelby, Miss., — U.S. -, 135 S.Ct. 346, 347, 190 L.Ed.2d 309 (2014) (per curiam) (quotation marks and citation omitted).

. The defendant’s concession renders moot whether janitorial duties were regularly expected from line officers at the facility. On that point, however, the defendant’s appellate brief states that when Wheat was reinstated as a JDS officer, "for the first few weeks after her reinstatement, she was given janitorial and intake duties, before being assigned regular JDS duties.” Defendant’s Brief at 14 (emphasis added). I take that to mean that janitorial and intake duties were not regular duties of an officer in Wheat’s position.

.Defense counsel likely assumed, reasonably, that Judges reviewing evidence for summary judgment purposes are aware of the ordinary meaning of janitorial duties, both as a matter of what that job physically entails and its attendant everyday meaning. Since it was obvious and unchallenged, Wheat did not have to attach evidence quantifying the amount of trash she had to pick up or the esteem in which her colleagues held janitorial work.
Consider other examples from everyday life: When a maitre de is assigned to do the duties *716 of a waiter or bus-boy, would there have to be a long discussion about what those specific duties are? Or wouldn’t the parties simply agree that the bus-boy cleans tables while the waiter takes orders and caters to the diners? Is there any doubt that a concierge would view the tasks of a hotel maid as less prestigious? If the business manager of an Am Law 100 firm was assigned to be a receptionist or runner, we would have no problem understanding the nature of the duties and the significance of the demotion. Or would wé?

. "It is well settled in this Circuit that the scope of appellate review on a summary judgment order is limited to matters presented to the district court.” Keelan v. Majesco Software, Inc., 407 F.3d 332, 339 (5th Cir.2005) (citations omitted). When arguments are "not even mentioned, much less argued, in the defendants’ motion for summary judgment, in the plaintiffs’ response to the motion for summary judgment, or in the district court’s memorandum opinion granting summary judgment,” they are "not properly presented to the district court” and cannot be considered on appeal. Keenan v. Tejeda, 290 F.3d 252, 262 (5th Cir.2002).
The district court dismissed Wheat’s janitorial reassignment by reasoning that three weeks' worth of those duties did not rise to the level of an ultimate employment decision. But that finding was infected by the application of what all parties and panel members agree was the wrong legal standard. The correct question is whether Wheat’s reassignment was materially adverse. It was. See Halliburton, 596 Fed.Appx. at 340-41.

. Although less compelling, the majority’s analysis of Wheat's delayed raise also merits discussion. At least to my eyes, Wheat's performance evaluation showed that her "Very Good” rating made her due for a 4% step increase. I am not sure how the majority concludes otherwise. Op. at 708.
Other record evidence supports an inference that Wheat should have received that evaluation and step increase months earlier. The affidavit of Assistant Shift Supervisor Brennan Sessions stated that "Ms. Wheat consistently earned annual pay raises, and *717 her job performance evaluations were either ‘Very Good' or ‘Outstanding.’ ” (Emphasis added). Since she reasonably expected annual raises tied to her annual performance reviews, it is premature to conclude that the delay was nonretaliatoiy, particularly when combined with the other retaliatory act (e.g., the janitorial duties).